HIGGINS, Justice.
 

 This is a suit by an assured against an insurance company, to recover certain disability installments alleged to be due under the policy, on the ground that he is permanently and totally disabled.
 

 Defendant denied liability.
 

 There was judgment in favor of the plaintiff, as prayed for, with the exception that the penalties which are provided for in Act No. 310 of 1910 were rejected.
 

 Defendant appealed and plaintiff did not answer the appeal.
 

 Plaintiff owned about
 
 700
 
 acres of land, which consisted of woodland, pasture, and farm lands. About 450 acres were under cultivation with cotton and corn. He also raised hogs on about 40 acres and had grazing lands for sheep and cattle, which he bought and sold. He milked cows and had a small vegetable garden in close proximity to his. home for his own use. There were about thirteen negro families, who were tenants on the farm on a share basis, but they were rigidly supervised by the plaintiff. He showed them how to plant and hoe the cotton and corn and tend the crops. He assisted in herding the cattle and in having them dipped. He actively directed the ginning and baling of cotton, the baling of hay, the repairing of fences, bought all the supplies for the farm, marketed its products, handled all of the financial matters, and was generally very active in overseeing, superintending, and operating the farm, being a healthy, robust man. His duties on the farm necessitated his riding a horse, driving an automobile, operating a tractor, and doing considerable manual ' work and walking. His family, consisting of a wife and two children, are living on the farm with him. He has been a farmer all of his life and knows no other trade or calling.
 

 While in the above described position, when he was forty-one years of age, on March 2, 1929, he made application for a $10,000 life insurance policy with the defendant, which was issued, carrying the disability and total indemnity clauses.
 

 On October 17, 1930, plaintiff was stricken with appendicitis and three days later was removed to a sanitarium in Monroe, La., where he was operated on
 
 *911
 
 the following day for a badly ruptured appendix. The appendix' was removed and “the abdominal cavity drained from the front and back/’ on account of the extensive infection, the main wound of about five inches being left open for better drainage. It was also necessary to divert the bowel movement through his side on account of a fecal fistula. He was confined to a hospital for forty-one days and to his bed at home for two more weeks.
 

 About three or four months after the operation, a large protruding ventral post-operative hernia resulted, which has gradually become larger and more pronounced, and he complains of nervousness, headaches, nausea, exhaustion, and gall bladder trouble.
 

 The plaintiff was paid disability installments for more than a year before the defendant stopped payments, claiming that he was not permanently and totally disabled within the meaning of the provisions of the policy:
 

 The pertinent part of the policy reads, as follows:
 

 “And if the insured is
 
 totally and presumably permanently
 
 disabled before the age of 60, will pay to insured $100.00 monthly during such disability, and
 
 increasing after five and ten years continuous
 
 disability, besides waiving premium payments on conditions set forth in Section 3.
 

 “Section 3. Total Disability.
 
 Disability shall be considered total
 
 when there is any impairment
 
 of mind or
 
 body
 
 which
 
 continually renders it impossible for the insured to follow a gainful occupation.
 

 “Permanent disability. Total disability shall during its continuance, be presumed to be permanent; (A) If such disability is the result of conditions which render it reasonably certain that such diability will continue during the remaining life time of the insured; or, (B) If
 
 such disability has existed continuously for ninety days.”
 
 (Italics ours.)
 

 The medical testimony is in accord to the effect that the plaintiff is incapable of performing strenuous and laborious work, and cannot perform all of the services he rendered in connection with the operation of the farm or plantation, prior to the time he was stricken with appendicitis.
 

 The testimony is in conflict as to whether or not the plaintiff is capable of performing the duties of a superintendent and overseer of the farm, which requires the driving of an automobile, riding horse back, walking, and hoeing in the fields for the purpose of demonstrating to the tenant farmers how their work should be done, and supervising the dipping of cattle.
 

 Dr. C. H. Mosley, who operated on the plaintiff, Dr. F. C. Sheppard, who attended the plaintiff and who was also employed by the defendant to examine applicants for insurance, and Dr. Thomas Sayre, who treated plaintiff, testified. that while the plaintiff’s mental capacity was not impaired, he was physically disabled from driving an automobile for an appreciable distance and length of time, particularly over farm or mud roads, from mounting, riding, and dismounting a horse, from walking for any considerable -distance,
 
 *913
 
 from milking cows, and using ,a hoe. It was their opinion that any physical exertion or strain would tend to enlarge the hernia, which was already very large, by causing additional portions of the intestines to enter the sac, resulting in grave danger of strangulation, which might result fatally.
 

 Dr. Edward A. Ficklen, Dr. Chas. Eshleman, Dr. Ernest Irion, and Dr. C. P. Gray, expert witnesses for the defendant, all agreed that the plaintiff is permanently and totally disabled from performing laborious and strenuous work. They state, however, that he is capable of managing and supervising his farm, because certain portions of it are accessible through turn rows, i. e., unimproved or mud roads, over which an automobile might be driven; that with the aid of a belt or abdominal support he could mount, ride, and dismount a horse, walk, supervise the dipping of cattle, and demonstrate how the plants should be properly hoed.
 

 Dr. Chas. Eshleman said the hernia was -as big as a grape fruit. Dr. Irwin described it as follows:
 

 “The hernial opening is about four and a half inches from the lateral to the medial side, and about three inches from that; that is from the lateral, it is obliquely situated about four and a half to five inches from the upper and outer edge of the lower and inside edge and about three to three and a half inches to the transverse diameter.”
 

 Dr. Mosley, who performed the operation, said that the entire incision of about five inches was left open for drainage and that, as there was an extensive infection in the abdominal cavity, portions of the muscles had sluffed off, causing a very weak condition of the abdominal wall and that only the skin had healed, leaving the intestine protected only by the peritoneum and the outer skin.
 

 Dr. Charles Eshleman also gave the following testimony:
 

 “Q. Suppose Mr. Boughton, instead of being a plantor as you have described him, is a dirt farmer, who plows on occasions, and a part of those duties would be to drive a tractor, and part, of those duties would be to ride a horse over a plantation in his effort to supervise what is being done; whose duties are to cut and bale hay, load hay, store it away in a barn, actually engaging in the cutting, pitching and lifting of the hay; in the operation of a baler; also the operation of a thresh.er, threshing oats, stacking the straw, getting up early in the morning at daylight, attending to the usual chores, milking cows, carrying water, attending to a vegetable garden necessitating a hand plow; and hoeing, digging fence holes and building fences, walking long distances to a field and getting cows, bringing them up to the barn and milking them, carrying off the milk, separating it, as well as making arrangements with bankers at distant places to finance his crops, necessitating the driving of a car; if his duties consisted of all these things, if that is his occupation doing the things I have just named in this hypothetical question, do you consider him incapacitated wholly to
 
 *915
 
 •do substantially all those things, either wholly or to any extent? A. I would consider that many of those duties come in the class of heavy manual labor, and therefore if he attempted to do any of those things, or all of those things, he would not he able to carry on. * * *
 

 “Q. Would you advise him not to ride :a horse? A.
 
 I would not think it would be helpful for him to ride a horse long distances,
 
 or to * * *
 

 “Q. But he could ride
 
 to some extent
 
 "Without injury? A. Yes.
 

 “Q.
 
 Could he without injury, carry the ■normal milk pail to the barn? A. I would ■not advise him to do it, because carrying or lifting things increases abdominal tension, and that is what you don’t want to .do.
 

 “Q. Could he, without injury to himself build a fence? A. I would not advise him to do that kind of work.” (Italics ours.)
 

 The plaintiff testified that since his .affliction he has been unable to do his work, as he formerly performed it; that he attempted to ride a horse, but his .abdominal belt pinched' and hurt him; that he has driven a car occasionally when "he could not get his son, or his brother, •or some one else to drive it; that he 'has gone in the field in his automobile .along the turn rows to supervise the tenants as best he could; that he has walked •on occasions; that he has attended to the purchasing and selling of the products of ■the farm by telephone and by going to town twice a week in an automobile; but, that all of these services were performed Tinder the most uncomfortable and painful circumstances, resulting in exhaustion, so that he was confined to his home with extreme nervousness, nausea, headaches, and gall bladder disturbances.
 

 The lay witnesses, whose testimony was introduced by the defendant, state that the plaintiff was very active in the performance of the required manual work, in connection with his farm, i. e., driving the tractor, ploughing, hoeing, herding cattle, baling hay and cotton, milking cows, etc., but that since being operated on, he was very inactive, depending upon his brother, brother-in-law, and son to assist him in v a large measure by superintending and giving orders to the tenants, driving the automobile, and herding cattle, etc.
 

 In the case of Crowe v. Equitable Life Assurance Society, 179 La. 444, 450, 154 So. 52, 54, we quoted with approval from Couch on Insurance, and Ruling Case Law, respectively, as follows:
 

 “ ‘It may be said, generally speaking the provisions in life, health and accident insurance policies for indemnity in case the insured becomes totally, permanently or wholly disabled, etc., do not require that he shall be rendered absolutely helpless, but, rather, merely requires such disability as renders him unable to perform the substantial and material acts of his business or occupation in the usual and customary way. At least such a rule has been in substance adhered to, where the policies required that he be totally disabled from transacting any and every kind of business.’ * * *
 

 “The rule is stated in 14 R.C.L., § 491, p. 131.5, as follows, viz.:
 

 
 *917
 
 “ ‘The rule prevailing in most jurisdictions is that the total disability contemplated by an accident insurance policy does not mean, as its literal construction would require, a state of absolute helplessness which can result only from loss of reason, since as long as one is in full possession of his mental faculties he is capable of transacting some part of his business, whatever it may be, although he is incapable of physical action. On the contrary, these courts, giving consideration to the object of the contract, hold that the “total disability” contemplated by the agreement is inability to do substantially all the material acts necessary to the prosecution of the insured’s business or occupation in substantially his customary and usual manner.’ ”
 

 See, also, Manuel v. Metropolitan Life Ins. Co. (La.App.) 139 So. 548; Cates v. New York Life Ins. Co. (La.App.) 159 So. 172; Phillips v. Mutual Life Ins. Co. of N. Y. (La.App.) 155 So. 487; Metropolitan Life Ins. Co. v. Lambert, 157 Miss. 759, 128 So. 750; New York Life Ins. Co. v. Best, 157 Miss. 571, 128 So. 565; Jefferson Standard Life Ins. Co. v. Simpson, 228 Ala. 146, 153 So. 198.
 

 In this case, the fact that it was the plaintiff’s good fortune to own several hundred acres of land and to have had years of experience in the operation of a farm, which placed him in a position where he could, by ingenuity and through the medium of tenant farmers and the assistance, support, and co-operation of his brother, brother-in-law, and son, keep the farm in operation, is no criterion of whether or not plaintiff is able to manage, supervise, or oversee a plantation or farm. Surely, if one were about to employ a man for like or similar services, the very fact that plaintiff would need the aid and help of members of his immediate family would disqualify him and show his incapacity and inability to substantially perform those services in the usual and customary way.
 

 It is said that the evidence shows that the plaintiff is successfully operating his farm and producing just as large a crop as he did before he was stricken. He testified that the farm was not being conducted as it was under his active administration and superintendence and that about 350 acres of it had been sold for taxes, which he was unable to pay, since his disability. It further appears that he has had to practically abandon the cattle business. The fact that a person may own land from which he gets revenues in the form of money, or a portion of the crop from tenants, who occupy and till the soil, is a very poor index, if any, to an afflicted man’s capacity and ability to earn a living through gainful employment. Would any one who has need for the services of an overseer, a manager, or a superintendent of a farm or plantation, or who was about to engage a person to perform work of a similar nature, kind, or character, employ a man handicapped with the physical disability with which the plaintiff is suffering? We think not, because he could not substantially and reasonably perform the services required of him. This test may not be infallible, but it is certainly pertinent and practical.
 

 
 *919
 
 Applying the ahove-quoted rule here, we find that the evidence is overwhelming that the plaintiff is totally and permanently disabled from operating his farm in the same manner as he did before the appendectomy operation. We further conclude that there is sufficient evidence in the record to support the finding of our learned brother below that the plaintiff is so afflicted as to “render him unable to perform the substantial and material acts' of his occupation in the usual and customary way.” After a careful review of the record, we are not prepared to differ with his view that the plaintiff is incapable of riding a horse or driving an automobile, while wearing an abdominal belt for the length of time required of an overseer, a manager, or a superintendent of a plantation or farm to perform his duties without discomfort, pain, and danger to his health and life.
 

 Defendant further contends that the plaintiff is not permanently and totally disabled, because, if he would consent to submit to an operation, he would have an excellent opportunity, without great danger to his life, to have the hernia eliminated. No authority of this state has been submitted in support of this theory and we are sure that there is none. The medical evidence in the case convinces us that the suggested operation would not only be dangerous to the plaintiff’s life, but also indicates rather forcibly that he would not have definite assurance that the condition would not recur. The exact percentage of mortality and recurrence in cases of operation for hernia of this type is in disputé between these doctors. They agree that this operation is more serious than an operation for inguinal hernia. Defendant’s own medical expert states that many intelligent patients refuse to run these risks, in spite of the fact that they have the advantage of a competent surgeon and modern' hospitalization. It is pointed out that there are many complications that can set in as a result of the administration of an anesthetic, as well as danger from shock and infection, particularly where the hernia resulted from a previous bad infection.
 

 In compensation cases, it has been uniformly held that the courts will not compel the claimant to suhpiit to an operation for the purpose of curing a serious hernia, or otherwise forfeit his claim to compensation. Crawford v. Tampa Inter-Ocean S. S. Co. (La.App.) 155 So. 409 (and cases therein cited); Yarbrough v. Great American Indemnity Co. (La.App.) 159 So. 438; Finley v. Texas Co. et al. (La.App.) 162 So. 473; Crawford v. T. Smith & Son, 183 La. 103, 162 So. 814.
 

 It is our opinion that plaintiff should not be compelled to submit to an operation, or otherwise forfeit his right to disability installments, because it is obvious that such an operation would seriously endanger his life.
 

 For the reasons assigned, the judgment appealed from is affirmed.
 

 O’NIELL, C. J., is of the opinion that the plaintiff’s disability is not total disa-. bility as defined in section 3 of the policy.
 

 
 *921
 
 ODOM, J., dissents and hands down reasons.