## LINK v. NEW YORK LIFE INS. CO.
### No. 2072.

Court of Appeal of Louisiana. First Circuit.
March 4, 1940.

Rehearing Denied April 10, 1940.
Writ of Error Refused May 27, 1940.

manently disabled before the age of sixty, subject to all the terms and conditions of the policy.

Under the terms of the policy, "disability shall be deemed to be total whenever the insured is wholly disabled by bodily injury or disease so that he is prevented thereby from engaging in any occupation whatsoever for remuneration or profit." The policy also provides that the disability shall be presumed to be permanent: "(a) Whenever the insured will presumably be so totally disabled for life; or (b) After the insured has been so totally disabled for not less than three consecutive months immediately preceding receipt of proof thereof."

The plaintiff is a rice farmer and was about thirty four years of age when this suit was filed in October, 1937. There is no question but that plaintiff was in good health and able to perform the work incident to rice farming from the time the policy was issued until about the year 1933, during which year he claims that he began to suffer from biliousness and indigestion; that he was treated from time to time but his condition grew worse. He alleges that he continued to raise rice with his father and brothers until the end of the year 1935, but that his condition had by this time become so bad that he could no longer engage in rice farming; that at the suggestion of his doctor, he applied to the defendant company for disability payments under the policy, and his claim was allowed and he received these monthly payments from March, 1936 through June, 1937, after which the company discontinued these disability payments and without any reason for so doing. He avers his continued disability and sues for the payments due in July, August, September and October, 1937, at the rate of $50 per month, and for a like amount every month thereafter so long as his disability continues. He also asks to recover double the amount of these payments plus attorneys fees in the sum of $350 as a penalty for delay in making the payments under Act No. 310 of 1910.

The defendant admitted the issuance of the policy and admitted that it had made the disability payments from March, 1936 to June, 1937, inclusive, but it averred that these payments were made solely on proofs submitted by plaintiff. The company admits that the payments were discontinued and that plaintiff was notified that no further payments would be made, but the company

Pugh & Buatt, of Crowley, for appellant.

Debaillon, Bailey & Mouton, of Lafayette, for appellee.

OTT, Judge.

The defendant insurance company issued a policy to the plaintiff in the year 1925 wherein the company agreed to pay the sum of $5,000 to the named beneficiary on the death of the insured from natural causes, and agreed to pay to the insured during his life time the sum of $50 per month and waive the premiums on the policy, if the insured, while the policy was in force, should become wholly and presumably per-

denies that its action in so doing was arbitrary and without reason; that plaintiff was not disabled within the terms of the policy.

The case was tried in May, 1938, and a judgment was rendered more than a year later. The judgment rejected the demands of the plaintiff and he has appealed. The reason given by the trial court for rejecting the demands of plaintiff was because of a failure on the part of plaintiff to prove that he was disabled within the terms of the policy. In addition to a rather voluminous transcript of both lay and expert testimony in the record, both sides have filed exhaustive briefs in which the evidence is analyzed in detail and the law applicable to the case is fully discussed. We must necessarily confine our discussion of the case to what we consider the most important parts of the evidence and the controlling legal principles involved.

At the outset, we think it is proper to state that most of the work that plaintiff was doing when he claims to have become disabled was hard manual labor. It is true that a good part of the work of a rice farmer in this day and time is done by motorized machinery, but there is a great deal of work that still must be done by the "sweat of the brow," such as shoveling dirt on the levees to prevent an overflow, pulling weeds from the growing rice, shocking and loading the rice, sewing up the sacks after the rice is threshed, and many other things requiring the strength of a strong and able-bodied man. Even driving a tractor is no weakling's job, and to be a successful rice farmer, as well as any other kind of farmer, requires that such farmer work from daylight to dark during a good part of the year.

■ With the nature of the work that plaintiff's occupation required him to do in mind, let us see what is meant under the policy by the term "total disability," as it is necessary to determine what is total disability before we can decide whether or not plaintiff has been so disabled since July, 1937. It is now well settled that total disability under policies of this kind does not mean that the insured must be in a state of helplessness, confined to his bed or unable to get about and do light work. All that is required is that he be unable because of the disease to perform the substantial and material acts of his occupation in the usual and customary way. Crowe v. Equitable Life. Assur. Soc., 179 La. 444, 154 So. 52; Boughton v. Mutual Life Ins. Co., 183 La. 908, 165 So. 140; Manuel v. Metropolitan Life Ins. Co., La.App., 139 So. 548; Pete v. Metropolitan Life Ins. Co., La.App., 171 So. 868; Smith v. Mutual Life Ins. Co., La.App., 165 So. 498.

■ Nor is it necessary under the terms of the policy for plaintiff to prove that his disability is permanent, if he proves that he has been unable because of the disease to perform the material and substantial acts of his occupation in the usual way for a period of at least three months. If his disability has continued for that length of time, it is presumed to be permanent under the terms of the policy. Frey v. Manhattan Life Ins. Co., 182 La. 821, 162 So. 633.

Taking up first the lay testimony, witness after witness testified that plaintiff did not and could not work on the rice farm during the years 1936 and 1937, and was still unable to so work when this case was tried in May, 1938. It is true that most of the lay witnesses who testified on this point were relatives of the plaintiff but two or three of them were not, among the number being the pastor of the church to which plaintiff belonged and who visited plaintiff frequently during his illness.

Plaintiff testified that during 1935 he continued to work but suffered from stomach trouble, rheumatic pains, headaches, and dizziness. His condition got worse and he had to give up his work in the early part of 1936 and has not been able to do any work of any consequence since then. At times he was confined to his bed, and has been under the regular treatment of Dr. Kahn since the fall of 1935. He made trips to Mineral Wells every year and stayed there two or three weeks at a time. He states that his knee swells when he tries to work and he has pains in his shoulder and gets weak after exertion. When he has these weak spells and rheumatism in his leg he has to go to bed for three or four days at a time. He says that the company notified him that the disability payments were discontinued because he was seen driving a car and going to a ball game. He admits that at times when he felt better he drove a car and went to ball games, but that this did not require much exertion and he did it for a pastime and on the advice of his doctor.

■ We could summarize the testimony of the other lay witnesses, but we think the testimony of the minister who has visited

plaintiff frequently since his illness should be sufficient corroboration of plaintiff from the standpoint of the layman, without giving any great amount of consideration to the relatives and friends of plaintiff who corroborate him in his statements. And we want to add here that we see no occasion to disbelieve or disparage the testimony of any of these witnesses. If their testimony is biased in favor of the plaintiff, we see no reason why some effort was not made by defendant to disprove their testimony by other neighbors who no doubt knew something of plaintiff and his condition over this period of more than two years.

The minister testified that he had visited plaintiff on the average of once a week during the past two or three years; that the plaintiff has not been well during that time and he either found him in bed or lounging around the house; that plaintiff has lost weight and looks pale and run down.

When we consider the lay testimony showing that plaintiff has not worked as he did prior to his illness; that he has been in bed at frequent intervals, has lost weight, complained of pain and weakness, visited health resorts and has been under the treatment of a doctor since the last part of 1935, it seems reasonable to assume that there is something wrong with him or else he is a first class malingerer. The trial judge did not think that plaintiff was faking an illness, nor do we find anything in the record to indicate that he is doing so or has any reason to do so.

We have given considerable attention to the lay testimony as we find much conflict in the medical testimony, some of which, we must state, is neither impressive nor convincing. Five doctors testified in the case, two for the plaintiff and three for the defendant.

Dr. Kahn has treated plaintiff regularly since the latter part of 1935. If anyone knows his condition, it seems to us that he should know more about it than any other doctors. The other doctors only examined plaintiff once or twice, and whatever their skill may be, it seems impossible that they could know as much about plaintiff's condition as the doctor who treated him regularly and saw him every week or two for more than two years.

Dr. Kahn is of the opinion that plaintiff is suffering from intestinal stasis, spastic colitis and inflamation of the gall-bladder. The intestinal stasis and spastic colitis cause the food to stagnate and putrify, scattering poison in the system. He says that this intestinal trouble has caused arthritis or rheumatism to develop in plaintiff's knee. The intestinal stasis and spastic colitis cause constipation, dizziness, gas pains, low blood pressure and weakness. He states that plaintiff's condition is about the same as when he first began treating him, except that arthritis has since developed from the toxemia in his system. His opinion is that plaintiff is not able to do manual labor, and has not been able to do this kind of work since he has been treating him.

Dr. Faulk examined plaintiff one time in the early part of 1938. He concluded that plaintiff had chronic gall-bladder trouble, with low blood pressure, weakness and sallow complexion. The doctor's opinion was formed from a physcial examination, together with the symptoms shown and the history given by plaintiff. While the doctor would not give an opinion as to plaintiff's ability to work, he did say that when he examined plaintiff he had symptoms of some chronic disease and was not able to work on that day.

Dr. Henry examined plaintiff for the defendant on March 7th and 8th, 1938, after the suit was filed. The doctor made x-ray pictures of the gall-bladder by what is known as the visualization test, from which test the doctor found what he calls a slight deficiency of 30 per cent in the filling and concentration of bile in the gall-bladder. He did not consider the gall-bladder normal, but terms the condition "a slight chronic gall-bladder disease." He found nothing wrong with the liver. A blood test indicated a low grade chronic condition somewhere in the system and the doctor ascribed this slightly low blood count to the gall-bladder trouble as that trouble could cause the difference in the blood count. From the pictures made by the doctor he found that the colon was slightly larger than found in some cases, but that it was within the normal range. He would not say that the colon was diseased, but did state that it showed a slight tendency toward spasticity.

Dr. Henry did not examine plaintiff's knee or shoulder and, of course, could not give an opinion as to whether or not there is any arthritis. The doctor only examined plaintiff for gall-bladder, liver and colon trouble by means of x-ray pictures and clinical tests. He admits that gall-bladder

trouble could cause gas on the stomach, indigestion, constipation, and other intestinal disturbances. But even this doctor does not say that plaintiff is able to do hard work on a farm. He says that plaintiff should be able to do some work, at times doing more than others. He says that a moderate amount of exercise would be beneficial, but when the doctor was asked if plaintiff could do work on a rice farm, he replied: "Yes, when you ask me that I am presuming that this man isn't doing day laborer's work. General management of a farm with the slight work incidental to it, I should say yes a man can do it."

Dr. Webb, defendant's local medical examiner, examined plaintiff twice, once in 1936 and once in 1937. The doctor found that plaintiff had gall-bladder trouble, and that the plaintiff gave him all the symptoms that go with gall-bladder trouble such as headache, dizziness, weakness, toxemia, etc. The doctor stated that he thought plaintiff could do some work, but did not say what kind.

The only doctor who gave plaintiff a clean bill of health was Dr. Peterman, who examined him one time in March, 1937. According to this doctor about every organ and function in plaintiff's body seems to be in good order. About the only trouble that this doctor found with plaintiff is that he is too introspective regarding his complaints—that is he exaggerates his trouble and thinks there is something wrong while he is organically sound. The doctor even goes so far as to say that taking plaintiff as a whole "he is in as fine a physical condition as ever I have seen a man."

There is testimony in the record by the plaintiff and Dr. Kahn that at the very time that Dr. Peterman examined the plaintiff the latter's knee was swollen and bandaged and Dr. Peterman attempted to touch the knee and plaintiff told him not to do so as it would hurt. Two doctors testified that in their opinion plaintiff is not able to work. Two of defendant's own doctors testified that he has chronic gall-bladder trouble and could do some kind of work. Only one doctor testified that plaintiff is able to do any kind of work.

■ In view of the strong and convincing lay testimony to the effect that plaintiff has not and could not work on his rice farm since the early part of 1936, coupled with a preponderance of the medical testimony that he does suffer from a chronic disease and is not able to do hard manual labor, we think that plaintiff is entitled to recover the disability benefits under the policy from the time the payments were discontinued.

■ We do not think that plaintiff is entitled to recover the penalties provided for in Act No. 310 of 1910. The refusal of the defendant to continue the payments after June, 1937, was based on a report of its physician that he did not think the insured was totally disabled. The inspector of the company reported in June, 1937, that Dr. Kahn, who was then treating plaintiff, told the inspector that he thought plaintiff could go back to work. While Dr. Kahn denies that he made this statement to the inspector but told him that plaintiff's condition was stationary, yet the company did not know at that time that there was a misunderstanding on this point on the part of the inspector and Dr. Kahn. With the information that the company had before it at the time, it cannot be said that its action in stopping the payments was unreasonable. Madison v. Prudential Ins. Co., 190 La. 103, 181 So. 871.

■ As the evidence shows that plaintiff was totally disabled from the time the payments were discontinued to the time of the trial, he is entitled to recover the monthly benefits as long as the disability continues. Defendant has the right under the policy to have the plaintiff examined at intervals to determine if his disability continues to be permanent. Madison v. Prudential Ins. Co. supra.

For the reasons assigned, it is ordered that the judgment be annulled, avoided and reversed, and it is now ordered, adjudged and decreed that plaintiff Clyde W. Link, do have and recover judgment against the defendant, the New York Life Insurance Company, in the sum of $50 per month for the months of July, August, September and October, 1937, and the sum of $50 per month thereafter as long as the disability of plaintiff continues, together with 5% per annum interest on each of said monthly payments from their respective due date, beginning with the first payment due July 1, 1937, and monthly thereafter as aforesaid; and that the defendant pay all cost of the suit.