HAMITER, Justice.
 

 Tom C. Pearson, in this action, seeks •to' recover disability benefits of $50 per •month from April 6, 1944, together with statutory penalties' and. attorney’s fees, allegedly due under a policy issued to him by defendant, the Prudential Insurance Company of America.
 

 Finding that plaintiff was totally and •presumably permanently disabled, as defined in the contract of insurance, the district court rendered judgment in his favor for all monthly benefits accruing on and after April 6, 1944, and also for the premiums paid during that period. 'The demand for penalties and attorney’s fees was rejected.
 

 Both defendant and plaintiff appealed to the Court of Appeal of the .Second Circuit, the latter’s appeal being, only from that part of the judgment which rejected his demand. That tribunal, holding that it was without jurisdiction because of the amount in dispute, transferred the appeals to this court. 29 So.2d 70.
 

 The policy in question, having a face amount of $5000, was issued to plaintiff on December 3, 1930, be at the time being 28 years of age. The written application therefor recited his occupation then to be “Planter (Farm Manager).” In addition to provisions for the payment of death benefits, the' policy contained clauses stipulating, in the event of total and permanent disability before his sixtieth birthday, á monthly - income to the insured of $10 for each'$1000 of the face amount of insurance, “beginning at the end of four months from the commencement of such total disability,” and further
 
 *223
 
 stipulating a waiver of all premiums. The defendant obligated itself to pay those benefits, according to the contract,
 

 “ * * * if the Insured shall become totally and permanently disabled, from bodily injury or disease, to such an extent as" to be incapacitated from engaging in any occupation for remuneration or profit, Provided,
 

 ******
 

 “(b) that the Company ' shall have received due proof that total disability exists and that such total disability is permanent, which shall be deemed to be the case if the Company shall have received due proof that such total disability has existed continuously during a period of not less than four months immediately preceding receipt by the Company of said proof;”
 

 The contract provided further:
 

 --“Proof of Continuance of Disability.— Notwithstanding the acceptance by the Company of proof of total- and permanent disability, or of proof of the duration of total disability for a period of four months, -the Insured, upon demand, by the Company from time to time, but not often■er than once a year after such total dis-ability has continued for two full years, for the purpose óf verifying that such total disability is actually pérmanent and not temporary, shall furnish 'due proof that ■ -the said Insured ' actually continues to', be totally disabled. If the Insured shall fail to furnish such proof, or if the Insured shall become able to engage in any occupation for remuneration or profit, the waiver of premiums and the payment of the monthly income shall cease from the end of the last completed month of total disability, but this Policy shall be continued in force subject to the payment by the Insured, in the manner and at the time provided in the Policy, of any premium or premiums, the due date of which, as specified in the Policy, shall occur thereafter.”
 

 In interpreting policy provisions similar to the above, this court, as well aos the Courts of Appeal of this state, has ruled that they do not require the insured to be absolutely helpless. before he is entitled to the monthly benefits; rather, it is -only necessary, under those provisions, that the disability render him unable to perform the substantial and material acts of his business or occupation in the usual and customary way. Crowe v. Equitable Life Assurance Society, 179 La. 444, 154 So. 52; Boughton v. Mutual Life Insurance Company of New York, 183 La. 908, 165 So. 140; Nomey v. Pacific Mutual Life Insurance Company, 212 La. 819, 33 So.2d 531; Manuel v. Metropolitan Life Insurance Company, La.App., 139 So. 548; Phillips v. Mutual Life Insurance Company of New York, La.App., 155 So. 487; Cates v. New York Life Insurance Company, La.App., 159 So. 172.
 

 
 *225
 
 With this rule in mind 'we proceed to a consideration of the disability on which plaintiff founds his claim. From the record it appears that in 1930, when the policy was issued, he was farming through the medium of share croppers a large portion of a 2300 acre plantation rented from the American Investment Company, he receiving for his efforts one-fourth of the crops produced. Additionally, he then operated a cotton gin which he owned. While still thus engaged in 1935, he purchased, on terms of credit, a farm of approximaetely 346 acres and commenced the cultivation of it. All of those activities, which continued until 1941, required not only his supervision of the persons working for and with him but also much manual labor and physical exertion on his part during each working day of from 12 to 20 hours. For example, in connection with the farming, he drove tractors, attached to which were cultivators, harrows and other necessary implements; on occasions he plowed with mules; he operated a combine and sacked and handled the oats harvested; and he did considerable carpentry work, building and repairing tenant houses. As to his gin, he did all of the actual mechanical work, including the making of needed repairs; he weighed the cotton, both before and after its ginning, climbing a sizable flight of stairs to do so; and he rolled out the completed bales for loading into trucks.
 

 During the morning of May 26, 1941, shortly after filling four sacks with oats and placing them in his pick-up car, he experienced severe pains in his chest, arms and shoulders. Later, he was taken to the Schumpert Sanitarium in Shreveport where he remained under medical care for several weeks. As to that experience, the brief of defense counsel correctly states: “In May, 1941, the plaintiff suffered an attack which knocked him out and there is no dispute that medical examination at the time showed that he was suffering from a heart attack commonly described as coronary heart disease and the medical examinations conducted by physicians, both on behalf of plaintiff and defendant, substantiated this 'diagnosis. The plaintiff was disabled for several years during which time the defendant recognized his claims for disability benefits and issued monthly payments in accordance therewith.”
 

 On returning to his home in the town of East Point, plaintiff followed the advice of the medical attendants, Dr. Car-lisle, his family physician and next door neighbor, and Dr. M. D. Hargrove of Shreveport. They advised that he should avoid any physical exertion which would produce pain and should rest regularly, eat moderately and take life easily and calmly; otherwise, abnormal exertion' might precipitate coronary thrombosis and prove fatal. Additionally, he installed in
 
 *227
 
 his home oxygen equipment which he used when pains recurred.
 

 Up until March, 1944, the defendant paid to plaintiff the monthly income of $50 and waived.the payment of premiums, all as stipulated in the policy. In a letter dated the 27th of that month, defendant’s claim appraiser informed plaintiff that his disability claim was being terminated and the policy restored to a premium payment basis. This action was based primarily on a medical report issued by Dr. W. S. Kerlin of Shreveport, following his examination of the insured in December, 1943, to the effect that plaintiff, in his opinion, was no longer totally disabled.
 

 Thereafter some correspondence passed between plaintiff’s counsel and defendant’s claim appraiser, and on January 3, 1945, this suit was filed. During the trial, which occurred in January,
 
 1946,
 
 plaintiff testified that since the initial attack in May, 1941, he has experienced similar pains in his arms and chest, and has consulted his family physician, approximately once every week. He has been unable to farm the American Investment Company’s 2300 acre plantation on a share cropper basis, from which he originally received 25 percent of the crops produced; instead, he has only written rent contracts for that owner with tenants, and for those services he received 10 percent of the production. In 1944 he purchased, on terms of credit, 494 acres of land, thereby bringing his ownership of farm property to 840 ácres; but to farm his holdings he has been compelled to employ managers, as well as to have the assistance of his wife and brother, inasmuch as he could stand no physical exertion. In the operation of his gin, which required mechanical work, weighing of cotton and bookkeeping, it has been necessary also to hire other persons. From 1936 to 1944 he served as a member of the Red River Police Jury, being the President of that body during a portion of such period. His services, however, required no physical exertion, and 'in offering for reelection he made no campaign.
 

 Other lay witnesses," who are farming neighbors, told of plaintiff’s having performed much manual labor before May 26/ 1941, and of his refraining from doing it since that date.
 

 The family physician (Dr. Carlisle), according to his testimony, has seen plaintiff professionally about once a week since May, 1941. Although none of the several electrocardiograms made subsequent to the original attack has disclosed the existence of coronary heart disease he is of the opinion that the patient is still suffering from that ailment. Additionally, plaintiff has, as shown by an X-ray picture made in 1945, a diaphragmatic hernia, this being a hernia caused by a portion of the bowel entering the diaphragm. The instructions of this physician, as initially, are: “To limit his activities as much as possible. Don’t
 
 *229
 
 do anything that he knows in advance would cause him to have pain.”
 

 Dr. Hargrove, a specialist in cardiology, who attended plaintiff in 1941 and then diagnosed his ailment as coronary heart disease, examined him last on December 18, 1945. Although at that time there appeared no objective symptoms, as originally shown by a cardiogram, he was of the belief that the patient still suffered from and was disabled as a result of the disease; the pains complained of were typical of it. Besides, X-ray pictures disclosed the existence of a diaphragmatic hernia.
 

 Defendant’s medical expert, Dr. Herold, examined plaintiff on May 18, 1945. In addition to making the usual physical tests, he fluoroscoped the heart and had a technician run an electrocardiogram. When asked to state his conclusion from the examination, he said: “Well, I would say that I found nothing abnormal from an objective standpoint; that is as far as you could tell from external examination. I found no evidence of disease. Subjectively, that is from his symptoms and statement,' I did feel like he had some abnormality.”
 

 Further, Dr. Herold gave the following pertinent and interesting testimony:
 

 “Q. Doctor, you have heard Mr.rPearson or did hear him recite' the conditions of his complaint and I believe you said that objectively you' found nothing but subjectively he did have a heart complaint? A. Yes.
 

 “Q. Now, how would you classify that heart complaint ? A. Practically every case, attack of coronary occlusion, you get even after the evidences of the condition have subsided, you get what we call angina pectoris; that means pain in the heart; pain in the chest.
 

 “Q. So based upon the subjective conditions which you considered he possibly had a coronary occlusion and angina pectoris? A. Yes, sir. That’s one of the causes of angina pectoris, is coronary disease.
 

 “Q. Doctor, let me ask you this question. If you were to examine him with this cardiogram instrument and make a cardiogram at the time that he was experiencing pains in the chest from angina, would that register on your cardiogram? A. Sometimes it will sjiow abnormalities, yes, sir, if the pain is severe. -
 

 “Q. But if you make an examination of a man who has angina at a time when he is nót experiencing pain in his chest, will it register on your cardiogram? A. Not unless he has some organic disease of the heart behind it.
 

 “Q. So then the test for angina in so far as the cardiogram is concerned would be to make a cardiogram while he is experiencing pain from angina? A. Yes.
 

 “Q. That’s correct? A. Yes, sir.
 

 
 *231
 
 “Q. So therefore the cardiogram that you made in your office when he was not experiencing pain is not a true test of whether or not he might have angina? A. Well, as I said you don’t always get abnormal cardiograms with angina, if there is no organic disease, but sometimes you do, if the pain is severe. .
 

 “Q. But you can only get them at the time when he is experiencing the pain? A. That’s right.”
 

 Dr. Herold’s explanation of the efficacy of the cardiogram accords with the views expressed by the other medical experts on that subject.
 

 From all of the evidence in the record it can only be concluded that there has been no noticeable improvement in the physical condition of plaintiff as it existed during the period immediately following May, 1941, in which the monthly benefits were being paid by defendant. Defense counsel, however, directs attention to plaintiff’s declaration in the application for the insurance in 1930 that he was a Planter or Farm Manager, and takes the position that, notwithstanding the disclosed present physical condition, no recovery can be had herein because the insured is able to successfully perform the customary acts of such an occupation and has actually done so, all as is shown by his accumulation of property and his increased earnings. Thus, in counsel’s brief it is said: “If we should assume the major premise of plaintiff • in his syllogism,— that plaintiff was a farmer in 1930 when he took out his insurance, — then we think it logically follows that he had shown a plausible basis for disability. But the facts do not support such a chain of thought because Mr. Pearson took out his policy in 1930 and declared that his occupation was a planter or farm manager. The natural import of such words is that the insured had investments in farm lands and exercised supervisory and managing duties over the farm and cotton gin. Once this major premise is corrected the plaintiff’s whole case dissolves because the insured has not shown the slightest inability to perform the customary acts of his occupation, as he stated it to be in the insurance contract. He is working at the same job, harder and more profitably than before.”
 

 Plaintiff denies that his income now is larger than it was prior to 1941; and he shows that much of his property is still mortgaged for the original purchase price. Furthermore, we do not understand that a planter or farm manager is restricted to supervisory or managing duties; at least
 
 nothing in
 
 the record discloses that to be true. But be that as it may to sustain the mentioned position of defendant it would be necessary for us to overrule the decision in the almost parallel case of Bough-ton v. Mutual Life Insurance Company' of New York, supra, for the doing of which there appears no good reason.
 

 In that case the insured was a farmer of plantation status, as is the plaintiff
 
 *233
 
 herein. Prior to receiving his disabling injury he not only supervised the operation of his 700 acre farm, on which there were 13 tenant families, but he also performed there numerous acts of manual labor, such as driving tractors, baling hay, repairing fences and herding cattle. A hernia developed, following an operation for appendicitis, and prevented a carrying on of his physical activities; however, his farming operations continued, under his supervision, through the medium of tenant farmers and with the assistance of relatives. In holding that he was totally disabled within the meaning of the insurance contract, we said [183 La. 908, 165 So. 143]:
 

 “In this case, the fact that it was the plaintiff’s good fortune to own several hundred acres of land and to have had years of experience in the operation of a farm, which placed him in a position where he could, by ingenuity and through the medium of tenant farmers and the assistance, support, and co-operation of his brother, brother-in-law, and son, keep the farm in operation, is no criterion of whether or not plaintiff is able to manage, supervise, or oversee a plantation or farm. Surely, if one were about to employ a man for like or similar services, the very fact that plaintiff would need the aid and help of members of his immediate family would disqualify him and show his incapacity and inability to substantially perform those services in the usual and customary way.
 

 “It is said that the evidence shows that the plaintiff is successfully operating his farm and producing just as large a crop as he did before he was stricken. He testified that the farm was not being conducted as it was under his active administration and superintendence and that about 350 acres of it had been sold for taxes, which he was unable to pay, since his disability. It further appears that he has had to practically abandon the cattle business. The fact that a person may own land from which he gets revenues in the form of money, or a portion of the crop from tenants, who occupy and till the soil, is a very poor index, if any, to an afflicted man’s capacity and ability to earn a living through gainful employment. Would any one who has need for the services of an overseer, a manager, or a superintendent of a farm or plantation, or who was about to engage a person to perform work of a similar nature, kind, or character, employ a man handicapped with the physical disability with which the plaintiff is suffering? We think not, because he could not substantially and reasonably perform the services required of him. This test may not be infallible, but it is certainly pertinent and practical.
 

 • “Applying the above-quoted rule here, we find that the evidence is overwhelming that the plaintiff is totally and permanently
 
 *235
 
 disabled from operating his farm in the same manner as he did before the appendectomy operation. We further conclude that there is sufficient evidence in the record to support the finding of our learned brother below that the plaintiff is so afflicted as to ‘render him unable to perform the substantial and material acts of his occupation in the usual and customary way.’ After a careful review of the record, we are not prepared to differ with his view that the plaintiff is incapable of riding a horse or driving an automobile, while wearing an abdominal belt for the ■length of time required of an overseer, a manager, or a superintendent of a plantation or farm to perform his duties without discomfort, pain, and danger to his health and life.”
 

 Obviously, this plaintiff, just as the insured in the Boughton case, could not now gain employment as a farm manager, overseer or superintendent. Due to his present physical disability and his condition of restricted activity, he can not reasonably perform the services required of a person in that occupation. His disability, therefore, being such as to render him unable to perform the substantial and material acts of his business ■ or occupation in the usual and customary way, and coming within the rule announced by our jurisprudence, plaintiff is entitled to> recover in this action.
 

 That part of the judgment of the district court which rejected plaintiff’s demand for statutory penalties and attorney’s fees was likewise correctly rendered, in our opinion. Under the provisions of Act No. 310 of 1910 an insurance company is to be penalized when it delays payment of benefits to the insured “for a longer period than thirty days from due notice and proof of disability, without just and reasonable grounds such as to put a reasonable and prudent business man on his guard.” This defendant did not delay the commencement of payments to the insured following his attack in May, 1941. On receipt of medical proof of his disabling condition, it began paying the stipulated monthly benefits, and continued them until March, -1944, or until after Dr. W. S. Kerlin, a highly reputable and prominent physician, reported to it that his thorough examination of the insured was convincing that the disability no longer existed. The report of this medical expert furnished •just and reasonable grounds for defendant’s discontinuance of the payments.
 

 The judgment is affirmed.
 

 O’NIELL, C. J., absent.