United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 4, 2007**

Charles R. Fulbruge III
Clerk

REVISED SEPTEMBER 21, 2007

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

————————————

No. 06-30168

————————————

WALTER RICHARD HOUSE, JR,

Plaintiff-Appellee-Cross-Appellant,

versus

AMERICAN UNITED LIFE INSURANCE COMPANY,

Defendant - Appellant-Cross-Appellee.

Appeals from the United States District Court for
the Eastern District of Louisiana
_____

Before REAVLEY, GARZA, and DENNIS, Circuit Judges.

REAVLEY, Circuit Judge:

Walter House sued American United Life Insurance Company ("AUL") for long-term disability benefits. The district court granted summary judgment by which total disability benefits and a Louisiana state law penalty were awarded to House. We hold that House's claim comes under an ERISA plan that preempts the state law penalty and that he was only partially disabled.

## I. Background

Walter House was a trial attorney and founding partner of his firm, earning approximately $350,000 per year. In October 1999, at age forty-nine, House suffered a heart attack. In that same month, House's law firm sought competitive proposals from several insurers to provide more affordable life and disability insurance for the entire firm, including attorneys and staff.

The firm entered into a subscription agreement for group life and disability coverage with AUL, providing for one class of life insurance coverage and three classes of disability coverage: Class 3 covering non-attorney employees, Class 2 covering non-partner attorneys, and Class 1 covering partners. The disability coverage for partners and non-partner attorneys was identical, except that (1) partners would contribute 100% of their premiums and their pre-disability earnings would be calculated using K-1 forms[1] rather than W-2s; and (2) the definition of total disability for the partner and non-partner attorneys (Classes 1 and 2) differed slightly from that applicable to the other non-attorney employees (Class 3). For attorneys, that term meant that "because of Injury or Sickness the Person cannot perform the material and substantial duties of his regular occupation." For the other employees, totally disabled meant that he or she "cannot perform the material and substantial duties of any gainful occupation for which the Person is

---

[1] Internal Revenue Service Schedule K-1 (Form 1065), "Partner's Share of Income, Deductions, and Other Items."

reasonably fitted by training, education, or experience."

Under the agreement, total disability benefits for all classes would replace the covered person's pre-disability monthly income up to $10,000, but subject to dollar-for-dollar reduction for other employment earnings. Partial disability benefits would be calculated through a stated formula, which yielded a percentage of the covered person's pre-disability income as reduced by other income and not to exceed a maximum $10,000 per month. Partial disability benefits would be subject to discontinuation upon the firm's termination as a "Participating Unit" in AUL's insurance trust — in other words, when the firm no longer maintained insurance through AUL.

The firm provided AUL with enrollment materials for all participants in the life and insurance coverage. On his enrollment form, House filled in his occupation as "Attorney." Because of House's cardiac problems, AUL required a letter from his doctor stating that he was able to return to work full-time with no restrictions before it would approve the group coverage. House's physician provided AUL a letter stating that House's prognosis was excellent and that he could return to work without any limitations. AUL notified the firm that the insurance application for the "group" had been approved and provided a rate exhibit stating the premium rates for all the coverage made available through the group policy. There was no distinction in rates between partners, associates, or staff, but rather a per-coverage-dollar rate for the entire group.

AUL provided certificates of insurance for delivery to the insured individuals, including House. The certificate House received, like the certificates all other firm

3

participants received, describes the disability coverage he was provided, but references the group policy as the source of all rights and benefits, that policy being subject to cancellation or termination by the firm or AUL. Under the group policy, the firm undertook responsibility for certain administrative tasks including determining eligibility for participation, enrollment of participants, calculation of premiums, and payment of premiums. The firm submitted a single premium check to AUL each month, deducting the partner's disability premiums from their draw accounts.

About a month after his October 1999 heart attack, House returned to his trial practice, but a year later he failed stress tests and subsequently underwent quadruple bypass surgery. He briefly returned to work in November 2000, but only to wind up his trial practice and reassign his clients, after which he left the firm. In October 2001, House accepted a position as executive counsel to the Louisiana Department of Economic Development, a non-litigation position that paid him $100,000 per year.

House initially applied for benefits under the AUL policy in November of 2000, contending that he was totally disabled because his doctor advised that returning to the stress of trial work could cause severe medical repercussions, including death. AUL paid nine months' of total disability payments to House from January to September 2001, apparently while evaluating his claim. Initially, AUL told House it would need an independent medical examination to assess his disability claim, but did not ultimately obtain one. Instead, in November 2001 and relying on its policy interpretation, AUL denied House's claim on grounds that, given his post-operative activities and current

4

employment, he appeared to be "capable of performing the sedentary occupation of an Attorney as it is normally performed in the national economy."

House sued, seeking full benefits and, under state law, penalties (related to bad faith refusal to pay, and misrepresentation), and attorneys fees. The parties filed a series of partial summary judgment motions debating ERISA[2] preemption and policy terms, and the district court held:

(1)     House's state law claims were not preempted because the policy was not an ERISA plan;

(2)     House was totally disabled based on policy language despite his ability to earn substantial income as an attorney;

(3)     House also qualified as partially disabled under the policy language, such status being not mutually exclusive with total disability as written; and therefore that;

(4)     House was entitled to the greater of:

(a)     the maximum monthly total disability benefit of $10,000 per month, but subject to offset by his earnings from the Louisiana agency, or

(b)     the partial disability benefit as calculated under the policy formula;

(5)     partial disability benefits terminated as of February 2002 when House's former firm terminated the firm's policies with AUL;

(6)     House was due total disability benefits without offset for the time frame of October 2001 to November 2003, when AUL was disputing that it owed

---

[2] Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

5

benefits, plus a penalty equaling an additional $10,000 for each month AUL did not pay during that time frame;

(7) House was entitled to total disability benefits with offset after the February 2002 termination date of the partial disability benefits because of the court's earlier determination that House was entitled to the greater of total or partial disability benefits;

(8) House was entitled to attorneys fees and costs.

Neither party was fully satisfied with the outcome and both appeal. House argues he is entitled to additional penalties and either offset-free total disability benefits or continuing partial disability benefits. AUL argues that the disability policy under which House is claiming benefits is governed by ERISA, state law penalties being therefore preempted, and challenges the district court's finding that House was simultaneously totally as well as partially disabled under the policy.

## II. ERISA Governance

We are presented with the threshold question of whether House's disability policy is a benefit plan regulated by ERISA. To determine the answer "we ask whether a plan: (1) exists; (2) falls within the safe-harbor provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA 'employee benefit plan' — establishment or maintenance by an employer intending to benefit employees." Meredith v. Time Ins. Co., 980 F.2d 352, 355 (5th Cir. 1993).

AUL asserts that House's state law claims for penalties and attorneys fees are preempted because the policy covering House was part of an "employee benefit plan" as defined by ERISA and not exempt under safe harbor. Relying on our decision in

6

Robertson v. Alexander Grant & Co., 798 F.2d 868 (5th Cir. 1986), the district court held that the Class 1 disability coverage for partners in House's firm was a separate plan and, since it benefitted only partners and not any employees, it was not governed by ERISA and therefore House was entitled to state law penalties and attorneys fees.

A. Standard of Review

We have frequently stated that the existence of an ERISA plan within the statutory definition is a question of fact. See, e.g., Meredith, 980 F.2d at 353. However, where the factual circumstances are established as a matter of law or undisputed, we have treated the question as one of law to be reviewed de novo. See id at 355. (stating our purpose as review of the summary judgment record for genuine issues of material fact, but applying the statutory scheme as a question of law to the facts established by the district court and overturning the district court's determination that an ERISA plan existed); see also Custer v. Pan American Life Ins. Co., 12 F.3d 410 (4th Cir 1993) (holding that when the factual circumstances are undisputed, whether the facts suffice to demonstrate the existence of a plan as defined by ERISA is a question of law to be reviewed de novo); JAMES F. JORDEN ET AL., HANDBOOK ON ERISA LITIGATION § 201(A) (3d ed. 2007) ("[W]hen the factual circumstances are undisputed, the existence of an ERISA plan is a question of law to be reviewed de novo."). It is clear that, while not so stating, we have followed our sister circuits in treating the existence of an ERISA plan as

7

a mixed question of fact and law.[3] In this case, where the parties concede the existence

of the firm's employee welfare benefit plan and the facts relative to whether House's

coverage was a part of that scheme or a separate plan were undisputed, the district court's

interpretation of the word 'plan' as used in ERISA poses a question of law subject to de

novo review.

      B.      Whether the policy under which House is claiming benefits in this
                action falls under the safe harbor exclusion.

With respect to the first Meredith inquiry (existence of a plan), there is no dispute

here that an intentional benefit plan existed at the firm. Thus we begin with the second

Meredith factor: to qualify as an ERISA plan, the plan cannot fall within the Department

of Labor's safe harbor exclusion.[4] The safe harbor provision states that a group or group-

---

[3] See, e.g., New England Mutual Life Ins. Co., Inc. v. Baig, 166 F.3d 1, 3 (1st Cir. 1999) ("[T]he district court's interpretation of the word 'plan' as used in ERISA poses a question of law subject to de novo review [but] the court's inquiry into the nature and the scope of the benefits actually at issue . . . demands factfinding, and is to that extent reviewable only for clear error.") (internal quotation and citation omitted); Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 256 (8th Cir. 1994) abrogated on other grounds by Ky. Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 341, 123 S. Ct. 1471 (stating that the existence of an ERISA plan is a mixed question of fact and law that on appeal is reviewed de novo); Peckham v. Gem State Mut. of Utah, 964 F.2d 1043, 1047 n.5 (10th Cir. 1992) (same).

[4] We begin with safe harbor analysis for the sake of clarity in tracking Meredith. We note that, if House's disability coverage were, as he urges, a wholly separate plan comprising non-employees only, it would fall outside of ERISA under prong three of Meredith and could not be swept back in by failure to qualify under the safe harbor analysis. In other words, if one's objective is, as House's, to prove a non-ERISA plan, establishing that the plan under consideration fails prong three (no employee welfare benefit plan), would render safe harbor analysis moot.

8

type insurance program will not be considered an ERISA Plan if (1) the employer does not contribute to the plan; (2) participation is voluntary; (3) the employer's role is limited to collecting premiums and remitting them to the insurer; and (4) the employer receives no profit from the plan. 29 C.F.R. § 2510.3-1(j). The plan must meet all four criteria to be exempt from ERISA.

There is no question that, considering the firm's life and disability plan as a whole, the safe harbor exclusion is not met. For Class 2 and 3 employees, participation was mandatory and the firm contributed 100% of the employees' premiums. We believe the same holds true for the Class 1 partner coverage standing alone. First, while the partners paid their own premiums for the optional disability coverage, they benefitted from the unitary rate structure the firm was able to negotiate by bargaining for disability coverage as a package for all classes. The partners therefore effectively received a premium discount or constructive contribution from the firm. Second, the firm's role was not, with respect to the Class 1 coverage, limited to merely serving as a conduit for partner premiums. We have found sufficient employer involvement to defeat safe harbor in cases where the employer had a lesser degree of administrative involvement than here. See, e.g. Hansen v. Continental Ins. Co., 940 F.2d 971, 977-78 (5th Cir. 1991).

We conclude that neither the multi-class life and disability coverage as a whole nor the specific Class 1 partner coverage meet the safe harbor exclusion. Even if safe harbor is barred, however, that does not necessarily mean that the insurance policy is part of an ERISA plan. A plan that falls outside of the safe harbor exception does not fall

9

within the jurisdiction of ERISA unless it satisfies the third <u>Meredith</u> prong.  <u>Hansen</u>, 940 F.2d at 975.

      C.     Whether the insurance policy under which House is claiming benefits in this
          action is part of an employee benefit plan under ERISA.

To meet the third <u>Meredith</u> prong, a plan must satisfy the primary elements of an ERISA 'employee benefit plan' — establishment or maintenance by an employer intending to benefit employees.  Under ERISA, an employee welfare benefit plan is, in pertinent part:

> . . . any plan, fund, or program, which was . . . or is . . . established or
>
> maintained by an employer . . . for the purpose of providing its participants or
>
> their beneficiaries, through the purchase of insurance or otherwise, . . .
>
> benefits in the event of sickness, accident, disability, death or unemployment
>
> . . . .

29 U.S.C. § 1002(1).  "The term 'participant' means any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan . . . ."  <u>Id</u>. at subsection (2)(B)(7).  Department of Labor regulations specify that any plan under which no employees are covered in not an ERISA plan, 29 C.F.R. § 2510.3-3(b), and that partners who wholly own a business are not normally employees of that business under ERISA, <u>id</u>. at subsection (c)(2).  <u>See Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon</u>, 541 U.S. 1, 21, 124 S. Ct. 1330, 1344 (2004) ("Plans that cover only sole owners or partners and their spouses . . . fall outside [ERISA's]

10

domain."); Meredith, 980 F.2d at 358 (finding no ERISA plan where group insurance policy covered sole proprietor and spouse and no employees); However, a plan covering both working-owner employers or shareholders as well as employees is governed by ERISA. Yates, 124 S. Ct. at 1341-42.

We clarify that § 2510.3-3(b) is specifically limited in its application to the determination of the existence of an employee welfare benefit plan. An owner of a business is not considered an "employee" for purposes of determining the existence of an ERISA plan; in other words, ERISA does not govern a plan whose only fully vested beneficiaries are a company's owners. See Yates, 124 S. Ct. at 1343-44 ("Plans that cover only sole owners or partners . . . fall outside [ERISA's] domain."). However, once an employee benefit plan is established (because other employees are covered by the plan in addition to the owner), a working owner, in common with other employees, is a plan "participant" governed by ERISA.[5] See Yates, 124 S. Ct. at 1341-42 ("Plans covering working owners and their nonowner employees, on the other hand, fall entirely within ERISA's compass.") (emphasis in original).

In Robertson v. Alexander Grant & Co., 798 F.2d 868 (5th Cir. 1986), relied upon heavily by the district court in the instant case, we held that a retirement plan benefitting only partners was, despite similarities to a parallel employee plan, distinctly separate and

---

[5] The dissent cites to cases that pre-date Yates, which clarified this two-part inquiry, citing and tracking our own reasoning in Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 294 (5th Cir. 1999) in determining that a working owner may qualify as a participant in an employee benefit plan covered by ERISA.

11

therefore not covered by ERISA. Id. at 871-72. In addition to Robertson, the district court also relied on Slamen v. Paul Revere Life Ins. Co., 166 F.3d 1102 (11th Cir. 1999). In that case, a dentist in a solely owned dental practice purchased separate disability insurance policies for himself and his employees, but at different times and from different insurers. The Eleventh Circuit applied our decision in Robertson to hold that Dr. Slamen's insurance policy was separate from the insurance benefits provided to his employees and was not governed by ERISA. Id. at 1105. House also directs us to a Ninth Circuit opinion, citing both Slamen and Robertson, and holding that a disability policy covering only the owners of a business is not converted into an ERISA plan simply because the employer subsequently sponsors a separate ERISA health insurance benefits plan for its employees. LaVenture v. Prudential Ins. Co., 237 F.3d 1042, 1046-47 (9th Cir. 2001). The court found no evidence that the disability policy and the unrelated health plan were so intertwined as to constitute one overall benefit plan. Id. at 1047.

We find no previous instance in which we have considered the application of Robertson to a multi-class group insurance policy where one class comprises only owners or partners. While the scheme established by House's firm (employer-paid disability coverage for non-partners with optional disability coverage available to partners at their own expense) appears to be a common one, there is a dearth of precedent on whether the partner class constitutes a separate non-ERISA plan. We note that in Wolk v. UNUM Life Ins. of America, 186 F.3d 352, 355 (3d Cir. 1999), under nearly identical facts — a multi-class disability policy under which partners paid for their own premiums for

12

optional coverage — the parties conceded that the policy was an ERISA plan. Although

not precedential, we find a Texas district court case instructive because of its equal

similarity to the facts of the instant case. See Lain v. UNUM Life Ins. Co., 27 F. Supp 2d

926 (S.D. Tex. 1998), rev'd on other grounds 279 F.3d 337 (5th Cir. 2002). Lain was a

partner in a law firm[6] that elected to provide disability insurance for all of its employees.

Id. at 927. Insurance for partners under the same policy was optional and the partners

paid the cost of their insurance. Id. at 927-28. The district court concluded that although

Lain was not a "participant" as defined by ERISA for the initial purposes of establishing

existence of an ERISA plan under 2510.3-3(b), she was a "beneficiary" of a plan

including both employees and partners and therefore had standing to sue under ERISA.

Id. at 934. ("The LTD plan expressly covers partners who pay their own premiums.

Because Lain paid her premiums, she was a beneficiary under the plan.").

Ultimately, guided by Yates, Wolk, and Lain, we find this case distinguishable

from Robertson, Slamen, and LaVenture. In each of those cases, separate and distinct

plans were maintained exclusively for owners. Here, the record reflects that the partner-

class disability coverage was part of a comprehensive employee welfare benefit plan

covering both partners and employees. The AUL life and disability insurance was

bargained and paid for as a package by the firm, through a single subscription agreement

resulting in a group policy. The policy contemplates and establishes a single plan, with

_____

[6] More precisely, Lain was the sole shareholder of Ellen Lain, P.C., which in turn
was a partner in the law firm.

13

the only distinctions between classes being the method of determining pre-disability earnings — since partners' variable, non-salary income would have to be calculated differently — and a more generic disability description to accommodate the variable occupations of the non-attorney participants. The rights of House as well as all non-partner attorneys and firm employees, while spelled out in their individual certificates of insurance, arose from the group policy.

The firm contributed 100% of the premiums for all non-partner participants and administered the entire insurance coverage for all classes of insureds. And as discussed above, while the partners paid their own premiums, they benefitted from the unitary rate structure the firm was able to negotiate bargaining for the disability coverage as a package, effectively receiving a constructive contribution from the firm. We therefore do not find the partners' premium contributions enough to establish the partner-class disability coverage as a separate plan under Robertson and conclude that the non-partner and partner-class life and disability coverage are sufficiently related and intertwined as to constitute one overall benefit plan. Because that plan benefits both partners and employees, it is governed by ERISA.

The district court's separate-plan holding would mean that partners and non-partner attorneys could assert identical claims relating to identical terms in the identical certificates of insurance issued by AUL and governed by a single subscription agreement, but the partners' disability claims would be governed by state law and the non-partner participants' disability claims would be governed by ERISA. State and federal courts

14

could be asked to read, interpret and apply the same policy provisions for persons in the various disability classes.  While we acknowledge that the primary purpose of ERISA is protection of employees,[7] we have recognized the anomaly of requiring some insureds to pursue benefits under state law while requiring others covered by the identical policy to proceed under ERISA as out of keeping with Congress's intent of achieving uniformity in the law governing employment benefits.  Hollis v. Provident Life and Accident Ins. Co., 259 F.3d 410, 416 (5th Cir. 2001);  see also Yates, 541 U.S. at 17-18; 124 S. Ct. at 1341-42 ("Recognizing the working owner as an ERISA-sheltered plan participant also avoids the anomaly that the same plan will be controlled by discrete regimes: federal-law governance for the nonowner employees; state-law governance for the working owner . . . Excepting working owner's from the federal Act's coverage would generate administrative difficulties and is hardly consistent with a national uniformity.") (citations omitted).

Because we conclude that the disability policy covering House was part of an ERISA plan, House's state law claims for penalties and attorneys fees are preempted.  29

---

[7] Congress enacted ERISA to correct abuses occurring in the administration of private retirement plans and ex plans.  Robertson v. Alexander Grant & Co., 798 F.2d 868, 870 (5th Cir. 1986) (citing S. Rep. No. 127 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 4838, 4838-44).  Employees in the traditional employer-employee relationship are more vulnerable to abuses because they lack control and input over pension plan management.  Id.  This concern does not arise where the benefit plan covers only the employer; such plans are excluded from ERISA's broad scope because when the employee and employer are one and the same, there is little need to regulate plan administration.  Id.

U.S.C. § 1144(a) ([ERISA's provisions] "supersede any and all State laws insofar as they may . . . relate to any employee benefit plan . . . ."). We therefore do not reach the issue of whether AUL's partial payment of disputed benefits relieved it from obligation to pay penalties.

## III. Degree of House's Disability

We turn to the issue of whether the district court erred in finding that House was "totally disabled" under the policy and that House could be deemed simultaneously both "totally disabled" and "partially disabled" under the policy. When called upon to interpret an ERISA-covered policy, "we construe the terms of the plan de novo unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Wegner v. Standard Ins. Co.,129 F.3d 814, 818 (5th Cir.1997) (internal quotation and citation omitted). As the record in this case reveals no such grant of discretionary authority to a fiduciary or administrator, the language of the policy guides our de novo interpretation. Id.

The policy definitions for Class 1 or 2 insureds (attorneys) provides that:

TOTAL DISABILITY and TOTALLY DISABLED mean that because of Injury or Sickness the Person cannot perform the material and substantial duties of his regular occupation.

PARTIAL DISABILITY and PARTIALLY DISABLED mean that because of Injury or Sickness the Person, while unable to perform every material and substantial duty of his regular occupation on a full-time basis, is:

     1.     performing at least one of the material and substantial duties of his regular occupation or another occupation on a part-time or full-time

16

basis; and

2.    is earning less than 80% of his Indexed Pre-
Disability Earnings due to that same Injury or
Sickness.

Because the terms "material and substantial duties" and "regular occupation" are

not defined in the policy, we accord the terms their ordinary and generally accepted

meaning.  Provident Life & Accident Ins. Co. v. Sharpless, 364 F.3d 634, 641 (5th Cir.

2004).   Reading the partial and total disability provisions in pari materia, in order to

obtain total disability benefits, House would have to demonstrate that he cannot perform

all of the material and substantial duties of his occupation.  In analyzing similar policy

provisions, we have concluded that this means a claimant is totally disabled only if he or

she cannot perform each and every material and substantial duty of his or her occupation.

Ellis v. Liberty Assurance Co. of Boston, 394 F.3d 262, 272  (5th Cir. 2004).  A claimant

is thus partially disabled under this policy if able to perform one or more, but not all, of

the material and substantial duties of his or her occupation.  See id. at 271-72.  The

definitions of total and partial disability under the AUL policy are therefore mutually

exclusive.

We find the district court's distinction between "trial lawyer" and "lawyer" too

fine under a common sense interpretation of "regular occupation."  A number of courts

have upheld an interpretation of "regular occupation" as meaning a general occupation

17

rather than a particular position with a particular employer.[8]   Although review of such an

interpretation in many cases was deferential, having been made by a plan administrator

vested with discretion, we do not believe that precludes a like interpretation here.

House's "regular" occupation was as an attorney, not restricted to his own specific job as

a litigation attorney with a uniquely stressful practice, but rather referencing the activities

that constitute the material duties of an attorney as they are found in the general

economy.  See, e.g.,  Osborne v. Hartford Life and Accident Ins. Co., 465 F.3d 296, (6th

Cir. 2007) ("Whatever the meaning of "regular" is, it is not synonymous with "own.").

    Even crediting the opinion of House's doctor that House's heart condition

---

[8]  See, e.g., Schmidlkofer v. Directory Distrib. Assoc., Inc., 107 Fed. App'x 631, 633-34 (6th Cir. 2004) citing Ehrensaft v. Dimension Works Inc. Long Term Disability Plan, 120 F.Supp.2d 1253, 1259 (D. Nev.2000) ("This Court finds that the term, 'occupation,' is a general description, not a specific one.... A person may not be able to perform a specific job assignment, but still be able to perform the duties generally understood to be part of his or her 'occupation.'  For example, a secretary is not disabled from his or her 'occupation' just because he or she cannot also perform additional tasks assigned by an employer, such as moving furniture or lifting heavy objects."); Dionida v. Reliance Standard Life Ins. Co., 50 F.Supp.2d 934, 939 (N.D. Cal. 1999) ("The term 'regular occupation' may be fairly construed to mean 'a position of the same general character as the insured's previous job, with similar duties and training requirements." ' (quoting Dawes v. First Unum Life Ins., Co., 851 F.Supp. 118, 122 (S.D.N.Y.1994))); Hanser v. Ralston Purina Co., 821 F.Supp. 473, 478 (E.D.Mich.1993) ("The court finds that defendant's interpretation of the terms 'regular occupation' as meaning the type of work which a covered employee is trained to perform rather than the specific job at which the employee was working when he became ill, is a rational interpretation supported by the plain meaning of the words."); cf. Valeck v. Watson Wyatt & Co., 266 F.Supp.2d 610, 620-21 (E.D.Mich.2003) (upholding as the interpretation of both "regular job" and "regular occupation" as "the kind of work [insured] did" rather than the "specific job in the specific office and with the specific supervisor and co-workers with whom she worked").

18

precludes him from resuming his stressful trial practice, House is clearly able to perform some of the material aspects of his occupation as an attorney, as evidenced by his post-surgery activities with his firm and his current legal employment with the Louisiana agency. Under the policy, this takes House outside of the definition of total disability and places him squarely within the definition of partial disability.

The dissent discusses total disability as if the policy does not at the same time define partial disability. When read together, at the same time the disability can be either total or partial but never both. So when the definition of partial disability fits the condition of House, that is his benefit.

House urges that such an interpretation runs afoul of Louisiana Revised Statute 22:230(C), which provides that "[a] general definition of total disability in [a disability loss of income policy] shall not be more restrictive than one requiring the individual to be totally disabled from engaging in any employment or occupation for which he is, or becomes, qualified by reason of education, training, or experience and which provides him with substantially the same earning capacity as his former earning capacity prior to the start of the disability."[9] However, section 22:230(D) permits an insurer defining total disability to "specify the requirement of the complete inability of the individual to perform all of the substantial and material duties of his regular occupation or words of

_____

[9] We note, and AUL concedes, that ERISA preemption does not preclude such argument because, if applicable, section 22:230 directly regulates the business of insurance and substantially affects the risk-pooling agreements between insurers and insureds. See 29 U.S.C. § 1144(b)(2)(A).

19

similar import."  As discussed above, the AUL policy's definition of total disability comports with this standard.   Further, while House's former occupation as a trial lawyer was clearly more lucrative than some other alternative practices and certainly more lucrative than his new agency job,  House might have switched to a more sedentary non-trial legal practice and still earned substantially more than he now does.  In sum, we cannot agree that the policy's total disability language is unduly restrictive under Louisiana law.

Because we conclude that House does not qualify as totally disabled under the policy language, we do not reach the issue of whether AUL is entitled to set off House's present earnings against total disability benefits.

IV.  Termination of House's Entitlement to Partial Disability Benefits

Finally, we consider the district court's conclusion that partial disability benefits terminated as of February 2002 when House's former firm terminated the firm's policies with AUL.  Reviewing the record de novo, we find no error.

"Under Louisiana law, the rights of the beneficiary of an insurance policy depend, first and foremost, on the terms of the policy."  Gonzales v. Prudential Ins. Co. of Am., 901 F.2d 446, 454 (5th Cir. 1990).[1]  "Supplementing the rights guaranteed to the beneficiary by the insurance contract are others that are established by the provisions of

---

[1]   Recognized as superseded by statute on other grounds (definition of disability under Louisiana law) as stated in Guidry v. Northwestern Mut. Life Ins. Co., 88 F. App'x 12 (5th Cir. 2004).

the Insurance Code and the jurisprudential rules that have sprung from it." Id. The Louisiana Insurance Code protects a beneficiary's claims for "benefits accrued or expenses incurred" against the contingency of the policy's subsequent unilateral cancellation by the insurer. LA. REV. STAT. ANN. § 22:213(B)(7). The Louisiana Supreme Court has held, Soniat v. Travelers Ins. Co., 538 So.2d 210, 215 (La. 1989), and we have assumed without deciding, Gonazales, 901 F.2d at 454, that this insurance-regulating state law provision is not preempted by ERISA. However, these rules do not protect a beneficiary against the contingency of the policy's subsequent termination, which we have defined in this context as "cessation of coverage under an insurance contract by reason of the passage of the policy period or the occurrence of some event anticipated by the terms of the contract." Gonzales, 901 F.2d at 455 (citations and internal quotations omitted); see also Soniat, 538 So.2d at 215 & n.12 (recognizing the distinction between cancellation and termination of insurance coverage under Louisiana law).

The policy covering House clearly contemplated that payment of benefits for a persisting total disability arising during a covered period would be extended throughout the duration of a beneficiary's normal working life. Section 5 of the policy reads: "EXTENDED BENEFIT: If the Person is Totally Disabled on the date of termination of insurance, AUL will pay benefits for Total Disability." However, the insuring provisions of the policy do not provide the same extended coverage for a partially disabling condition, that coverage expressly ceasing upon, among other enumerated events,

termination of the firm's coverage under the group policy.   Section 8 of the policy reads, in relevant part: "[T]he Partial Disability Benefit will continue until the EARLIEST of the following: . . . 9.  The date the policy terminates; or 10. The date the Participating Unit's [the firm's] coverage under the policy terminates."  Because, under the terms of the contract, no right to permanent partial disability coverage was bargained or provided for, no right to perpetual partial disability benefits accrued to House prior to the termination of the policy.  The cessation of AUL's liability for partial disability payments at the time House's former firm ceased to be a covered "Participating Unit" constitutes a termination rather than a cancellation of coverage and thus does not run afoul of the Insurance Code.

V. Conclusion

This decision rejects the contentions of House's appeal.  The case is remanded to the district court for recalculation of what amounts are due House consistent with this opinion.

REVERSED AND REMANDED.

DENNIS, Circuit Judge, dissenting:

Because the majority opinion (1) disregards our holding in Robertson v. Alexander Grant & Co., 798 F.2d 868 (5th Cir. 1986) to find that the insurance policy is governed by ERISA and (2) ignores the provisions of Louisiana Revised Statute section 22:230 and Louisiana jurisprudence on total disability policy definitions to conclude that Walter House does not qualify as totally disabled under the policy language, I respectfully dissent.

## I. ERISA Coverage

As an initial matter, the majority misstates the standard of review for the question of whether House's insurance policy constitutes an ERISA plan. In McNeil v. Time Insurance Co., 205 F.3d 179, 181 (5th Cir. 2000), we reviewed an identical question in a similar posture. There, a district court had dismissed state law claims on summary judgment on the grounds that a single insurance policy covering both a partner and an employee as beneficiaries constituted an ERISA plan, preempting the state law claims. Id. at 189. We applied two different standards: the question of whether the "insurance policy constituted an ERISA plan" was a fact issue reviewed for clear error, while the question of

whether ERISA preempted state law claims was a legal one reviewed de novo. Id.; see also Provident Life and Acc. Ins. Co. v. Sharpless, 364 F.3d 634, 638 (5th Cir. 2004). Here, the majority recasts the same question of whether the insurance policy constitutes an ERISA plan as a mixed question of fact and law that is subject to de novo review. Applying McNeil, we should review the district court's decision that the partner House's policy was separate from the employees' policy for clear error, and I do not believe that any error here is significant enough to overcome that hurdle.

Under either standard, however, I would affirm the district court's determination that House's policy was not part of an ERISA plan. In Robertson, we held that plans benefitting only partners were not covered by ERISA because of the unique negotiating posture a partner assumes vis-à-vis his firm. Robertson noted that

> [e]mployees in the traditional employer-employee relationship are more vulnerable than partners in a partnership are to abuses because workers typically lack control over pension plan management and input into the decision whether to extend pension benefits to certain employees. On the other hand, a partner has more control and input than does an employee since

-24-

a partner has a vote in partnership affairs. Furthermore, a partnership contains a self-policing feature largely absent in the typical employer-employee relationship. In the partnership situation the partners have an incentive not to agree to provisions that may harm certain members of the partnership because each partner knows that he could end up being the partner who is harmed.

798 F.2d at 870.

This logic is especially forceful here. House was not only a partner of the law firm, but a founder with his name in the most prominent position. House's superior control and input as a partner is evident from the facts found by the district court. It noted that House was able to obtain advantages over the policy given to employees. House's income covered by the policy included his entire net income, whereas employees were limited to their base salary under a forty hour workweek. House v. Amer. United Life Ins. Co., No. 02-1342, 2004 WL 856671, at *9 (E.D. La. Apr. 20, 2004). House also was able to secure a much more favorable definition of total disability as compared to his employees. He could be considered totally disabled if "because of Injury or Sickness the Person cannot

perform the material and substantial duties of his regular occupation," whereas employees could be totally disabled only if they "cannot perform the material and substantial duties of any gainful occupation for which the Person is reasonably fitted by training, education, or experience." Id. (emphasis added). Under Robertson's rationale, House was not vulnerable to abuse under his policy because of his status as a partner and ERISA was not intended to provide him with protection.

Robertson does not support the contention that if the policy is "intertwined" with policies of employees, a partner's separate policy becomes covered by ERISA. To the contrary, Robertson rejected an argument that the plans in that case were virtually identical and thus were really a single plan. The intertwinement argument "ignores the fact that the plans, however similar, are two separate plans. The plan covering the partners does not pay any benefits to principals, and the plan covering principals does not pay any benefits to partners." Robertson, 798 F.2d at 871. If two virtually identical plans covering different groups of employees are considered separate plans, I see no basis here to hold that there is a single policy where partners paid for their policies individually while the premiums of employees were paid by the firm, partners received different benefits from those negotiated for employees, and

-26-

employees were required to participate whereas partners were not. That the policies were purchased at the same time and both tasked the firm with minimal administrative duties does not adequately distinguish the case from Robertson in my view. Robertson is vague as to its facts, but appears to involve two parallel and separate Keogh plans, with nearly identical terms, administered by an accounting partnership on behalf of its partners and its employees.

There is certainly nothing about purchasing policies for employees and partners at the same time that eliminates the bargaining advantage a partner has over an employee. To the contrary, it likely enhances it - the partners, able to control which insurance company their employees are forced to select, gain added negotiating leverage for their own policies. Likewise, common administration of separate and distinct policies for employees and employers does not disadvantage the partner in any way - House as a partner was in a prime position to control the administration of his own policy. Robertson reasoned that because partners were situated such that they could exercise control over their own plan, the application of ERISA to partners was unnecessary to protect them from their employers - in other words, themselves. Even if the policies here were intertwined, that does not change the fact that House as a partner did not need protection under ERISA, and that, under the

plain terms of the statute, protection would not extend to his policy unless an employee was covered by it. And here, as Robertson noted, "the [policies], however similar, are two separate [policies]." Id.

Other Circuits are in accord. The Ninth Circuit has decided this issue and taken the opposite approach from the majority opinion. In In re Watson, 161 F.3d 593, 596 n.4 (9th Cir. 1998), a partner argued that while his plan was separate from that of the employees, it was sufficiently related to the employee's plan as to warrant ERISA coverage for his own plan as well. The court rejected this argument, holding that "even if the plans were created simultaneously or shared other common characteristics, they are independent plans under ERISA." Id.; see also LaVenture v. Prudential Ins. Co. of Amer., 237 F.3d 1042, 1046 (9th Cir. 2001) (reiterating Watson and adding that "a company may offer more than one benefit plan, one covering only the owner of the business and the other covering the business's employees, and maintain those two plans as independent plans under ERISA").

Similarly, the Eleventh Circuit has held that "non-ERISA benefits do not fall within ERISA's reach merely because they are included in a multibenefit plan along with ERISA benefits." Kemp v. IBM Corp., 109 F.3d 708, 713 (11th Cir. 1997). Kemp noted that including a non-ERISA benefit within an ERISA

plan does not convert that benefit into one covered by ERISA. Id. Judge Livavdais of the Eastern District of Louisiana, in applying Robertson to reach a holding similar to that in Kemp, noted the potential consequences of any other interpretation:

> If any court endorsed this view, the insured's choice to participate in a policy other than a group policy would be rendered meaningless; ERISA would become a boundless piece of legislation, sweeping within its scope all claims made under separate policies purchased to provide benefits in addition to those provided by ERISA plans.

St. Martin v. Provident Life & Acc. Ins. Co., Nos. 92-2120, 92-4244, 1993 WL 262708 (E.D. La. July 2, 1993).

Moreover, the cases cited by the majority do not change my view that Robertson should guide the Court's analysis here. As the majority points out, Yates dealt with situations in which an employee benefit plan covered both a working owner, such as a partner, and at least one employee. See Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 124 S. Ct. 1330 (2004). The Supreme Court specifically noted that "if a benefit plan covers only working owners, it is not covered by Title I [of ERISA]." Id. at 22 n.6 (citing

appellate cases) (emphasis added); see also id. at 21 ("Plans that cover only sole owners or partners . . . fall outside [ERISA's] domain."). Thus, Yates does not support the majority's intertwinement argument where, as here, there is a related but separate policy for partners, to which employees do not have access. Further, in Wolk, the parties conceded, without any substantive analysis by the Third Circuit, that the benefit plan at issue was governed by ERISA as it pertained to both partners and employees. See Wolk v. UNUM Life Ins. of Amer., 186 F.3d 352, 355 (3d Cir. 1999). The Third Circuit therefore only addressed whether, as a matter of law, the plaintiff partner, who was designated to receive benefits under the employee benefit plan, qualified as a plan "beneficiary." It was not called upon to decide the issue facing us here. Finally, it is unclear from the facts presented in Lain v. UNUM Life Ins. Co. of Amer., 27 F. Supp. 2d 926 (S.D. Tex. 1998), to what extent the partner's plans were related to the employee's plans. In any event, Lain is not binding on this Court and its summary distinguishing of Robertson should not influence our analysis.

In sum, the parties have cited no authority supporting the argument that merely because two policies are related to each other, the rationale of Robertson does not apply. The authority from our Circuit and others supports the opposite conclusion. Respectfully, I would affirm on this issue under either the clearly

erroneous standard or the de novo standard of review.

## II. Total Disability Definition

I also believe the opinion is in error in reversing the district court's determination that House was totally disabled under the policy. As AUL concedes, ERISA does not preempt Louisiana law regulating the business of insurance, such as Louisiana Revised Statute section 22:230 and state court decisions limiting and interpreting insurers' definitions of total disability in disability income policies. In concluding that House does not qualify as totally disabled, the majority applies decisions that are distinguishable and inapposite here: Ellis v. Liberty Assurance Co. of Boston, 394 F.3d 262, 272 (5th Cir. 2004) and Provident Life & Accident Ins. Co. v. Sharpless, 364 F.3d 634, 641 (5th Cir. 2004).

Ellis is inapposite because, in that case, we found that ERISA preempted state-law unfair claims processing and good faith and fair dealing claims, and we applied the ERISA abuse of discretion standard in affirming the plan administrator's denial of total disability income benefits. 394 F.3d at 275-76. As already noted, ERISA preemption does not apply here because Section 22:230 directly regulates the business of insurance and substantially affects the risk-pooling agreements between insurers and insureds. Sharpless is inapposite for

similar reasons.  There, we determined that ERISA preempted the Louisiana statute under which the insured brought her claim, and thus applied contract interpretation principles pursuant to federal common law.

In the present case, Section 22:230, pertinent state court decisions, and the policy definition at issue required the district court to grant House's total disability claim.  Section 22:230 provides:

> A.  An individual or group disability loss of income policy to provide loss of income protection against total disability may be issued in this state consistent with the definitions and provisions of this Section.

> B.  Total disability may be defined in relation to the inability of the person to perform duties but shall not be based solely upon an individual's inability to:

> (1)  Perform "any occupation whatsoever", "any occupational duty", or "any and every duty of his occupation"; or

(2)  Engage in any training or rehabilitation program.

C.  A general definition of total disability in such a policy shall not be more restrictive than one requiring the individual to be totally disabled from engaging in any employment or occupation for which he is, or becomes, qualified by reason of education, training, or experience and which provides him with substantially the same earning capacity as his former earning capacity prior to the start of the disability.

D.  An insurer may specify the requirement of the complete inability of the individual to perform all of the substantial and material duties of his regular occupation or words of similar import.

E.  An insurer may require care by a physician other than the insured or a member of the insured's family.

(emphasis added).

The Louisiana Civil Code provides the general principles for the interpretation of laws as follows: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." LA. CIV. CODE ANN. art. 9. "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." LA. CIV. CODE ANN. art. 10. "The words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter." LA. CIV. CODE ANN. art. 11. "When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole." LA. CIV. CODE ANN. art. 12. "Laws on the same subject must be interpreted in reference to each other." LA. CIV. CODE ANN. art. 13.

To properly interpret the statute and the policy a court must also take into account Louisiana's long and unique jurisprudential history of construing such terms in disability income statutes as "total disability," "occupation," "regular occupation," and "all of the substantial and material duties of his regular occupation," in addition to Section 22:230 and its predecessor statutes. As

Louisiana legal practitioner-scholars have recognized, this jurisprudence was part of the background upon which the legislature acted in enacting Section 22:230. WILLIAM SHELBY MCKENZIE & H. ALSTON JOHNSON, III, 15 LA. CIVIL LAW TREATISE § 290 (3d ed. 2007).

Under Louisiana cases, total disability has never required proof that an insured is reduced to a state of abject helplessness. Laborde v. Employers Life Ins. Co., 412 So.2d 1301, 1304 (La. 1982) (citing Crowe v. Equitable Life Assurance Soc'y of the United States, 154 So. 52, 54 (La. 1934); Madison v. Prudential Ins. Co. of America, 181 So. 871 (La. 1938); Nomey v. Pacific Mut. Life Ins. Co., 33 So.2d 531 (La. 1948); and Pearson v. Prudential Ins. Co. of America, 36 So.2d 763 (La. 1948)). In Johnson v. State Farm Mutual Automobile Insurance Company, 342 So.2d 664, 667 (La. 1977), the Louisiana Supreme Court relied on this line of cases to interpret an insurance policy defining total disability as the inability to engage in "every duty of his occupation" to mean the inability to "perform the substantial and material part of his occupation in the usual and customary way."

Accordingly, the Louisiana Supreme Court, in Laborde, announced that, where an insurance policy expressly purported to adopt the interpretation AUL urges here, the policy would instead be construed to define total disability as

"whether he could have performed the substantial and material part of his occupation in the usual and customary way." 412 So.2d at 1304. In fact, the policy definition of total disability in Laborde was virtually identical to the one the majority applies: "complete inability of the Insured . . . to perform every duty pertaining to his occupation." In Johnson, total disability was similarly defined as the inability to perform "every duty of his occupation." 342 So.2d at 667. Notably, the liberal meaning imposed in place of these nominally strict definitions omitted the word "every."

Subsequent to these cases, the Louisiana Legislature in 1991 enacted Louisiana Revised Statute section 22:230, a provision plainly intended to limit the ability of insurance companies to adopt overly restrictive definitions of total disability. A leading Louisiana insurance law treatise, WILLIAM SHELBY MCKENZIE & H. ALSTON JOHNSON, III, 15 LA. CIVIL LAW TREATISE § 290 (3d ed. 2007), recently explained how the enactment of Section 22:230 had substantially incorporated the Louisiana courts' jurisprudential total disability standards:

> There is no reason to expect that our courts will abandon the
> liberal interpretation accorded the concept of disability.
> Indeed, there may be less reason to do so than there would be
> in the field of workers' compensation. . . . In the health and

accident field, the cost is often borne directly by the insured, who has a much greater argument that he should be entitled to a fair shake on the coverage that he paid for.

Indeed, recent legislative amendments provide that disability definitions cannot be simply whatever an insurer might want them to be. Act 879 of 1990, now appearing as La. R.S. 22:230, establishes a definition of disability beyond which an insurer apparently may not go. Coverage for total disability obviously may be offered in Louisiana, but with certain restrictions.

Id. (footnotes omitted).

With this background in mind, applying the Louisiana Civil Code principles of legislative interpretation, it is evident that the purpose of Section 22:230 is to protect the interests of the insured by placing definite limitations on how insurers may define and apply "total disability" in disability income policies. Paying careful attention to the terms of art as defined by the Louisiana courts in previous cases, construing the statute's provisions in reference to each other, in context, and in conformity with the purpose of the law, the statute in essence provides for: (1) Prohibition of defining total disability in the absolute,

unqualified sense: Insurers may not define "total disability" solely as inability to perform "any occupation whatsoever", "any occupational duty", or "any and every duty of his occupation"; or as inability to "[e]ngage in any training or rehabilitation program;" (2) Maximum level of restrictiveness in such definitions: Insurers may define "total disability" in general no more restrictively than as "totally disabled from engaging in any employment or occupation for which [the insured] is, or becomes, qualified by reason of education, training, or experience and which provides him with substantially the same earning capacity as his former earning capacity prior to the start of the disability;" and (3) Specific requirement of insured's complete inability to perform all duties of insured's regular occupation: Insurers "may specify the requirement of the complete inability of the individual to perform all of the substantial and material duties of his regular occupation or words of similar import."  Thus, insurers may condition total disability benefits on the insured individual's complete inability to perform all of the important duties of his regular occupation, but to do so requires that the insurer specify this requirement of such complete inability in the policy so that it is called to the insured's attention and agreed to by him.

The disability loss of income policy in this case defines total disability as follows:

"TOTAL DISABILITY and TOTALLY DISABLED mean that because of Injury or Sickness the Person cannot perform the material and substantial duties of his regular occupation."

The majority misreads the requirements of Section 22:230 and simply disregards the Louisiana jurisprudence defining the terms of art used in the statute. Rather, it mistakenly applies the inapposite decisions in Ellis and Sharpless, and, in my opinion, incorrectly concludes that the policy definition must be construed to mean that "in order to obtain total disability benefits, House would have to demonstrate that he cannot perform all of the material and substantial duties of his occupation. . . . [T]his means a claimant is totally disabled only if he or she cannot perform each and every material and substantial duty of his or her occupation." Moreover, the majority also declares "the district court's distinction between 'trial lawyer' and 'lawyer' too fine under a common sense interpretation of 'regular occupation.'" Thus, according to the majority, under the policy definition, an attorney would have to be unable to perform each and every material and substantial duty of the legal profession in general in order to qualify for total disability benefits.

I respectfully disagree with the majority's conclusions for several reasons.

First, the majority's definition of total disability as inability to perform every duty of lawyers generically is even more restrictive than the "any and every duty of his occupation" definition prohibited by Section 22:230(B)(1). Use of the term "regular occupation," in Louisiana and in general, means the individual insured's usual and customary means of earning a livelihood, and does not permit the insurer to define total disability at an unreasonably high level of generality so as to offer the insured no real protection in the event he becomes disabled to perform the duties required by his previous regular income-earning activities. As a lawyer, House was still qualified and able to work as a civil servant or governmental attorney, but as a regular occupation that role did not provide him with the earning capacity of his pre-disability high-stress job as an active, experienced actual trial lawyer.

Second, the Louisiana courts have never allowed "total disability" to be defined or applied so restrictively against insured policyholders' interests. See Laborde, 412 So.2d at 1304 (rejecting an insurer's advocacy of a definition of total disability similar to that of the proposed opinion in favor of reading the test as "whether he could have performed the substantial and material part of his occupation in the usual and customary way"); Johnson, 342 So.2d at 667 (same).

Third, the Louisiana courts' interpretation of total disability policy

definitions, as well as that adopted by the statute, is in accord with that of state courts' in general. See, e.g., 46 C.J.S. <u>Insurance</u> § 1089:

> Total disability does not mean absolute helplessness, or inability to do anything, or inability to engage in any kind of business pertaining to insured's occupation, or absolute lack of earning power. However, an inability to perform some aspects of insured's occupation does not rise to the level of total disability.

> Total disability exists when one is wholly disabled from pursuing the usual and customary duties of his employment on which he must depend for a living, or any substantial part of his ordinary duties, or when the injury is such that common care and prudence require insured to desist, and he does in fact desist, from transacting his business.

> \* \* \*

> Generally, when an insurance contract refers to an occupation in promising payments if insured is unable to work, the occupation

-41-

referred to is the occupation that insured was carrying on at the time that he was injured. When insured lists an occupational description on his application that varies from what he actually does, the court will look to his actual duties, not the application, to determine insured's occupation.

(footnotes omitted) (collecting and citing authorities).

Fourth, as interpreted and applied by the majority, the policy definition would be more restrictive than the maximum level permitted by Section 22:230(C). That is, it would disqualify House for total disability benefits even though in his present law practice capability he does not have substantially the same earning capacity as his former earning capacity prior to the start of the disability; thus, the majority impermissibly interprets "total disability" more restrictively than permitted by law.

Fifth, AUL in its policy did not take advantage of the opportunity offered by Section 22:230(D) for it to "specify the requirement of complete inability" of House "to perform all of the substantial and material duties of his regular occupation or words of similar import." The policy merely uses a boiler-plate: "TOTAL DISABILITY . . . mean[s] that because of Injury or Sickness the Person

cannot perform the material and substantial duties of his regular occupation."

Thus, because AUL did not obtain House's agreement to the specific requirement that, to recover total disability benefits, House must have complete inability to perform all of the substantial and material duties of his regular occupation, as authorized by Louisiana Revised Statute 22:230(D), neither AUL nor this Court can define "total disability" contrary to the requirements of Section 22:230 (A)-(C).


III.   Conclusion

For these reasons, I respectfully submit that the Court should affirm the district court's judgment because that court did not commit: (1) a clear error of fact or an error of law in finding that the partner-employer's disability income policy was separate from the law firm's ERISA-protected and governed employees' group insurance; or (2) an error of law in interpreting and applying state law to the total disability definition in the disability income policy of House, the partner-employer.