**Gregory P. GOODEN, Plaintiff,**

**v.**

**UNUM LIFE INSURANCE COMPANY OF AMERICA and Unum Group Corporation, Defendants.**

**1:14-CV-280**

United States District Court, E.D. Tennessee, Southern Division, at Chattanooga.

Filed 03/30/2016

Eric L. Buchanan, Hudson T. Ellis, Eric Buchanan & Associates, PLLC, Chattanooga, TN, M. Clayborn Williams, Miles Clayborn Williams, Thomas O. Sinclair, Sinclair Williams LLC, Birmingham, AL, for Plaintiff.

Marina Madalina Visan, James T. Williams, IV, Miller & Martin, PLLC, Chattanooga, TN, for Defendants.

## MEMORANDUM

CURTIS L. COLLIER, UNITED STATES DISTRICT JUDGE

Before the Court is a motion to remand filed by Plaintiff Gregory P. Gooden. (Doc. 12.) Plaintiff argues that the Court does not have jurisdiction over this action because the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"), does not apply to the insur-

ance policy in question. Defendants Unum Life Insurance Company ("Unum Life") and Unum Group Corporation ("Unum Group") filed a response (Doc. 17), and Plaintiff filed a reply (Doc. 20). Also before the Court is Defendants' motion to file a surreply (Doc. 21), to which Plaintiff responded in opposition (Doc. 22). For the following reasons, the Court will **DENY** Defendants' motion to file a surreply,[1] **GRANT** Plaintiff's motion to remand, and **REMAND** this case to the Circuit Court for Hamilton County, Tennessee.

## I. BACKGROUND

Plaintiff was a physician with the Gessler Clinic, P.A. in Winter Haven, Florida from September 1987 to January 2007.[2] During this time period, the Gessler Clinic offered a group long-term-disability insurance policy to all of its active, full-time physicians and administrators through Continental Casualty Company ("CNA").

In 1991, the Gessler Clinic allowed Jim Tollerton, an insurance agent, to come into the clinic to meet privately with "a limited number of highly compensated" physicians, including Plaintiff, regarding their insurance needs. (Doc. 14-5 at ¶¶ 5, 6.) The clinic did not attend or supervise any of these meetings. It also did not "contract with Mr. Tollerton to sell individual Unum policies, did not advertise Unum policies, [and] did not include in brochures or employee handbooks any mention of individual Unum policies." (Doc. 14-5 at ¶ 12.)

On August 22, 1991, as a result of meeting with Mr. Tollerton, Plaintiff completed an application for disability insurance from Unum Life. Unum Life subjected the application to individual underwriting with an insurability date of August 22, 1991, and issued an individual disability insurance policy to Plaintiff with an effective date of October 1, 1991. Unum Life issued individual policies to other physicians at the Gessler Clinic around the same time, also as a result of those physicians' respective meetings with Mr. Tollerton at the clinic.

Unum Life offers group discounts on insurance policies through its FlexBill program. The FlexBill program requires that at least three individuals who are working full time with the same company have

---

1. Defendants' proposed surreply is not necessary and would not assist the Court in resolving the issues before it. Defendants argue a surreply is needed to counter two alleged mischaracterizations by Plaintiff: first, that none of the relevant communications were initiated by the employer, and second, that Plaintiff's policy was issued before the "Flex-Bill" program was established. The parties' differing positions on these factual issues are already clear from the existing briefing. Further argument on these points would serve no purpose. Defendants also seek to submit additional authority on whether there was a "contribution" to the policy. As pointed out by Plaintiff, two of the relevant cases in the proposed surreply were already cited in Defendants' responsive brief. The third case on contribution in the proposed surreply, *Kuehl v. Provident Life & Accident Ins. Co.*, No. 97–C–1021, 2000 U.S. Dist. LEXIS 21625, at *10 (E.D.Wis. Apr. 20, 2000), is already within the Court's consideration because it was relied on

by one of the main cases discussed by this Court below. Finally, however, the Court notes that Plaintiff is mistaken in opposing the surreply on the grounds that it does not involve developments occurring after Defendants' brief was filed. Two types of additional briefs are contemplated by Local Rule 7.1(d): briefs filed with prior approval of the Court, and supplemental briefs addressing subsequent developments. An additional brief need only meet one of these requirements, not both.

2. The parties dispute the precise nature of Plaintiff's relationship with the Gessler Clinic and the impact of that relationship on whether there is an employee welfare benefit plan governed by ERISA in this matter. Because the policy at issue is within the regulatory "safe harbor," however, the precise nature of Plaintiff's relationship with the Gessler Clinic is irrelevant to the Court's analysis.

their premiums for qualifying insurance products billed to and paid through their company. Participants in a FlexBill program receive a discount of up to 35% on their premiums and are eligible for a higher benefit amount than insureds who pay their own premiums directly. Because at least three Gessler Clinic physicians bought qualifying insurance products that were billed to the Gessler Clinic, Unum Life established a FlexBill program for the Gessler Clinic on August 26, 1991, four days after Plaintiff completed his insurance application but more than a month before the effective date of his policy. Plaintiff and the other insured physicians received premium discounts of approximately 15% when paying their premiums through the FlexBill program.

The Gessler Clinic did not negotiate with Mr. Tollerton or Unum Life to be included in the FlexBill program, nor did it negotiate the size of the discount its insured physicians would receive. It did not pay any portion of the insurance premiums for any of the physicians' policies from the clinic's own funds. It did, however, agree to collect premium payments for the insured physicians' policies through payroll deductions and remit those premium payments to Unum Life as billed through the FlexBill program. The Gessler Clinic also received (and in some cases presumably responded to) such correspondence from Unum Life as a request for updated income information for the insured physicians (Doc. 18-6), a letter stating that Plaintiff would no longer be offered a "Benefit Indexing Option" because his coverage exceeded Unum Life's guidelines (Doc. 18-7), and a notice of overdue premiums (Doc. 18-8). Sharon H. Hart of the Gessler Clinic completed and signed a benefit claim form on Plaintiff's behalf on

June 7, 2005, for a claim that is apparently unrelated to the current dispute. (Doc. 14-13.)

On January 17, 2007, the Gessler Clinic notified Unum Life by letter that Plaintiff's last day at the clinic had been January 10, 2007, and asked Unum Life to "send him any necessary paperwork so he may continue this policy if he so desires." (Doc. 14-14.) Unum Life sent responsive information to Plaintiff and Plaintiff continued the policy, paying the premiums directly and no longer receiving the Flex-Bill discount.[3]

Plaintiff submitted a claim for benefits under his Unum Life policy in April 2013. On August 19, 2014, Plaintiff filed a complaint against Defendants in the Circuit Court of Hamilton County, Tennessee, alleging breach of contract and bad-faith failure to pay his claim under Tennessee law. (Doc. 1-1.) Defendants removed the matter to this Court on September 24, 2014, alleging federal-question jurisdiction under 28 U.S.C. § 1331 on the grounds that the policy is governed by ERISA. (Doc. 1.) Plaintiff disputed the removal and the application of ERISA to his policy (Docs. 5, 6), and the Court allowed the parties to conduct discovery on the limited issue of whether ERISA applies to determine whether the Court has subject-matter jurisdiction over this action (Doc. 9).

Plaintiff filed a motion to remand on July 1, 2015, supported by a memorandum of law, a declaration of Ms. Hart of the Gessler Clinic, and various exhibits. (Docs. 12–14.) Defendants filed a response on July 27, 2015, supported by a declaration of Carol A. Bigelow of Unum Group, a declaration of John E. Ellis IV of the Gessler Clinic, and various exhibits. (Docs. 17–19.) Plaintiff replied on August 6, 2015.

---

**3.** The Gessler Clinic also communicated with Unum Life regarding the clinic's request to delete at least one other insured physician from the FlexBill. (Doc. 18-9.)

(Doc. 20.) Defendants filed their motion for leave to file a surreply on August 14, 2015, with a copy of their proposed surreply attached as an exhibit (Doc. 21), and Plaintiff responded in opposition on August 17, 2015 (Doc. 22).[4]

## II. STANDARD OF REVIEW

■ The party seeking removal to federal court bears the burden of establishing the district court has original jurisdiction over the matter. *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 757 (6th Cir.2000). Removal petitions are strictly construed, with all doubts resolved against removal. *Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332, 339 (6th Cir.1989).

## III. DISCUSSION

■ Defendants contend the Court has federal-question jurisdiction because the disability insurance policy at issue is part of an employee welfare benefit plan that is governed by ERISA. ERISA defines an "employee welfare benefit plan" to include the following:

> any plan, fund, or program ... established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ... disability ... benefits ....

29 U.S.C. § 1002(1). Thus, an employee welfare benefit plan has been established if "from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Int'l Res., Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir.1991) (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982)). The United States Court of Appeals for the Sixth Circuit has explained as follows:

> [T]he gist of ERISA's definitions of the terms employer, employee organization, participant, and beneficiary is that a plan, fund, or program falls within the ambit of ERISA only if [it] covers ERISA participants because of their employee status in an employment relationship, and an employer or employee organization is the person that establishes or maintains the plan, fund, or program.

*Fugarino v. Hartford Life & Accident Ins. Co.*, 969 F.2d 178, 185 (1992), *abrogated on other grounds by Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 124 S.Ct. 1330, 158 L.Ed.2d 40 (2004).

The Sixth Circuit has adopted a three-step factual inquiry for courts to use in evaluating whether a particular plan falls within ERISA's scope as an employee welfare benefit plan:

> First, the court must apply the so-called "safe harbor" regulations established by the Department of Labor to determine whether the program was exempt from ERISA. Second, the court must look to

---

**4.** The Court pauses to observe that the aggressive tone of some of the parties' briefing does not advance their respective causes. Plaintiff's four-page "Introduction," for example, details what he believes to be improper manipulation by Defendants, as allegedly evidenced by an internal memorandum discussing the benefits of ERISA in insurance litigation. (Doc. 13 at 1–4.) This discursion is distinctly unhelpful to the Court, which must decide the jurisdictional issue based on the applicable law and the facts surrounding this particular insurance policy. Also unhelpful is Plaintiff's assertion that if Defendants had made an assertion other than the one they made, that behavior would have been sanctionable (Doc. 20 at 4). The Court reminds the parties that civility and advocacy are not mutually exclusive.

see if there was a "plan" by inquiring whether "from the surrounding circumstances a reasonable person [could] ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits." Finally, the court must ask whether the employer "established or maintained" the plan with the intent of providing benefits to its employees.

*Thompson v. American Home Assurance, Co.*, 95 F.3d 429, 434–35 (6th Cir.1996) (internal citations omitted) (alterations in original).

As relevant to the first step of this factual inquiry, the Department of Labor's safe-harbor provision exempts from ERISA any group-type insurance program an insurer offers to employees or members of an employee organization if all of the following criteria are met:

(1) No contributions are made by an employer or employee organization;

(2) Participation [sic] the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j).

The parties agree that the second and fourth safe-harbor criteria are satisfied here, in that Plaintiff's participation in the program was completely voluntary and the Gessler Clinic received no consideration in connection with the program. Defendants contend, however, that the policy is governed by ERISA because it fails both the first and third criteria of the safe harbor. The Court addresses these contentions below.

### A. Contributions by the Gessler Clinic

The first safe-harbor criterion requires that the employer or employee organization make no contributions to the insurance program. 29 C.F.R. § 2510.3–1(j)(1). It is undisputed that the Gessler Clinic did not pay any portion of the premiums for Plaintiff or any other insured physician. Defendants argue, however, that the discount Plaintiff and the other insured physicians received because of the FlexBill program constitutes a contribution sufficient to remove the program from the safe harbor. Defendants cite a number of cases in which district courts have concluded that a discount of this type constitutes such a contribution. In response, Plaintiff argues that Unum Life's unilateral actions in giving a discount cannot compromise the Gessler Clinic's neutrality, pointing out that many of the cases finding a discount to be a contribution did so because that discount was negotiated by the employer.

█ The Court of Appeals for the Sixth Circuit has not addressed whether a group discount constitutes a "contribution" under the first safe-harbor criterion. A number of courts in this and other circuits have done so, however, reaching inconsistent results. The Court has considered the available persuasive authority and the arguments of the parties. For the following reasons, the Court concludes that a non-negotiated group discount that applies only because

premiums are paid through payroll deduction is not a "contribution" under the first criterion of the safe harbor.

### 1. *Brown v. Paul Revere Life Ins. Co.*

One of the earliest and most frequently cited cases to state that a premium discount constitutes a contribution under the safe harbor is *Brown v. Paul Revere Life Ins. Co.*, No. CIV.A.01–1931, 2002 WL 1019021 (E.D.Penn. May 20, 2002). The professional corporation at issue in *Brown* hired a financial advisor to explain how it could provide benefits to its employees. The advisor apparently said, incorrectly, that if the corporation paid for benefits, the benefits could later be collected tax-free. *Id.* at *1 & n.2. The corporation then set up a system under which the corporation paid for such things as continuing education, conferences, travel, and insurance premiums for its physician shareholders out of funds designated as each shareholder's "bonus" money, with any unused "bonus" funds being distributed to the shareholders as income later.[5] *Id.* at *1–*2.

The court found the corporation had made a "contribution" precluding the application of the safe harbor because the corporation had paid the insurance premiums. The plaintiff argued that he himself had paid the premiums, since the funds that were spent on premiums would have been paid to him as a bonus if they had not been spent on premiums. The court, however, concluded that because the plaintiff's contemporaneously filed tax returns did not report the premiums as taxable income, he was estopped from arguing that he, and not the corporation, had paid his insurance premiums. *Id.* at *3, *7. Because payment of insurance premiums is a contribution, the safe harbor did not apply. *Id.*

at *7 (citing *Morris v. Paul Revere Ins. Group*, 986 F.Supp. 872 (D.N.J.1997)).

The *Brown* court went on to state in dicta, however, that even if the corporation's arrangement were considered simply as a payroll deduction system, the corporation would still have "contributed" to the policy "by enabling payments from pre-tax income and by allowing [the plaintiff] discounted premiums," in that the employer had provided its employees a benefit they could not have received as individuals. *Id.* at *7. The court relied on three grounds for this conclusion, each of which this Court finds to be problematic when applied elsewhere.

First, *Brown* relied on a dictionary definition of the idiom "contribute to," meaning to have a "share in bringing about a result[;] . . . be partly responsible for." *Id.* (quoting WEBSTER'S NEW WORLD DICTIONARY 303 (1988)) (alterations in original). The court therefore concluded that the corporation "contributed" to the policy when it allowed the plaintiff to access a group discount he would not have been able to obtain individually. The safe harbor, however, never uses the idiom "contribute to." Rather, the safe harbor uses the simple noun "contributions": "No *contributions* are made by an employer or employee organization . . . ." 29 C.F.R. § 2510.3–1(j)(1) (emphasis added). This Court is not persuaded that a dictionary definition of an idiomatic form of a word that appears in a regulation should affect the interpretation of the regulation when the idiom itself does not appear in the regulation.

Second, *Brown* relied on 26 C.F.R. § 54.4980B–2, a Consolidated Omnibus Budget Reconciliation Act ("COBRA") reg-

---

5. The factual context of *Brown* was, therefore, a system planned and set up by the corporation for the express purpose of benefitting its shareholders. This factual context is not present in this case or in many of the other cases relying on *Brown* to interpret the safe harbor.

ulation, which states a group health plan is "maintained" for purposes of COBRA *"even if the employer or employee organization does not contribute to it* if coverage under the plan would not be available at the same cost to an individual but for the individual's employment-related connection to the employer ...." 26 C.F.R. § 54.4980B–2 (emphasis added). *Brown* acknowledged that this language *distinguishes* between an employer's contribution and a discount not otherwise available to the insured, and that the regulation therefore "could be read against" the insurer. 2002 WL 1019021, at *7 at n. 7. The opinion, however, brushed away both the difference between ERISA and COBRA and the actual COBRA regulatory language, to draw the improper conclusion that if a discount is enough to qualify as "maintenance" under one regulation, it is enough to qualify as a "contribution" under the other. *See id.* ("If an employee's ability to buy a policy at a discount rate by virtue of his employment status suffices to 'maintain' a policy under the COBRA regulation, it should also create an employer contribution under the safe harbor.")

Finally, *Brown* extracted the proposition that "contribution exists where [a] 10% discount [is] available only to employees in group plans" from a single unreported case which relied on other facts to find that a policy was covered by ERISA. *Id.* at *7 (citing *Kuehl v. Provident Life & Accident Ins. Co.*, No. 97–C–1021, 2000 U.S. Dist. LEXIS 21625, at *10 (E.D.Wis. Apr. 20, 2000) (partial payment of other premiums within overall insurance program subjected plan to ERISA; in the alternative, individual policy's premium discount and other features were created by insurer and employer together for the benefit of employer's employees)). In addition, like *Brown, Kuehl* incorrectly relied on a COBRA regulation that finds maintenance of a health plan by an employer "regardless

of whether the employer contributes to it, if coverage under the plan would not be available at the same cost to an employee in the event that he or she were not employed by the employer." *Kuehl*, 2000 U.S. Dis. LEXIS 21625, at *10–*11 (quoting Treasury Regulation 1.162–26). As stated above, this conclusion fails to recognize either the difference between ERISA and COBRA or the regulation's distinguishing between a contribution and a discount.

The Court thus respectfully declines to follow the dicta in *Brown* equating a group discount with a contribution under the safe harbor. For the same reasons, the Court finds unpersuasive the line of cases following *Brown* without analysis of its theoretical foundations. *E.g., McCann v. Unum Provident*, 921 F.Supp.2d 353, 366 (D.N.J. 2013); *Healy v. Minn. Life Ins. Co.*, No. 11–CV–00659–DGK, 2012 WL 566759, at *5 (W.D.Mo. Feb. 21, 2012); *Harding v. Provident Life & Accident Ins. Co.*, 809 F.Supp.2d 403, 417–18 (W.D.Penn.2011); *Tannenbaum v. Unum Life Ins. Co. of Am.*, No. 03–CV–1410, 2006 WL 2671405, at *6 (E.D.Penn. Sep. 15, 2006); *Stone v. Disability Mgmt. Servs., Inc.*, 288 F.Supp.2d 684, 691–92 (M.D.Penn.2003).

### 2. Cases Addressing Negotiated Discounts

A number of cases have discussed whether a premium discount negotiated by an employer, either alone or in conjunction with other factors, constitutes a contribution under the safe harbor. *E.g., House v. Am. United Life Ins. Co.*, 499 F.3d 443, 449 (5th Cir.2007) (partners who paid their own insurance premiums received "constructive contribution" from law firm because they "benefitted from the unitary rate structure the firm was able to negotiate by bargaining for disability coverage as a package for all classes," including nonpartner employees who were required to

participate in coverage and whose premiums were paid by firm); *Moore v. Life Ins. Co. of N. Am.*, 708 F.Supp.2d 597, 607 (N.D.W.V.2010) (following *House*, 499 F.3d at 449; safe harbor not available where plaintiff benefitted from negotiated rate structure); *Alexander v. Provident Life & Accident Ins. Co.*, 663 F.Supp.2d 627, 633 (E.D.Tenn.2009) (on motion for summary judgment, plaintiff failed to submit evidence to dispute insurer's evidence that employer paid 35% of premiums; stating in dicta that "contribution" could also be found through negotiated group discount); *Chatterton v. Cuna Mut. Ins. Soc'y*, No. 3:07–0167, 2007 WL 4207395, at *4 (S.D.W.V. Nov. 26, 2007) (contribution found where union negotiated rate structure).

Other cases, in which there was no evidence that a discount was negotiated, have cited negotiated-discount cases as authority for the conclusion that any discount is a "contribution." *E.g.*, *Henderson v. The Paul Revere Life Ins. Co.*, No. 3:11–CV–1992–D, 2013 WL 1875151, at *8–*9 (N.D.Tex. May 6, 2013) (relying in part on *House*, 499 F.3d at 449, without evidence of negotiation); *Zide v. Provident Life & Accident Ins. Co.*, No. SACV 10–00393–JVS, 2011 WL 12566818, at *8 (C.D.Cal. Apr. 13, 2011) (relying in part on *Alexander*, 663 F.Supp.2d at 633, and *Chatterton*, 2007 WL 4207395, without evidence of negotiation).

There is no evidence that the Gessler Clinic negotiated for any aspect of the FlexBill discount on behalf of Plaintiff or the insured physicians. The Court accordingly need not resolve the question of whether negotiation of a group discount can ever constitute a contribution to an insurance program. The Court finds, however, that cases involving a negotiated discount and cases which neglect to address the distinction between a negotiated discount and a non-negotiated discount are not helpful to the resolution of the issue before the Court.

### 3. Cases Addressing Other Contributions by Employer

A third category of cases addressing whether a premium discount is a contribution consists of cases in which facts in addition to a premium discount supported the conclusion that the safe harbor did not apply. In many of these cases, the employer paid a portion of the premiums—an indisputable contribution under the safe harbor. *See, e.g.*, *Boles v. UNUM Life Ins. Co. of Am.*, 847 F.Supp.2d 1161, 1166 (D.Neb.2012) (employer paid part of premiums); *Spillane v. AXA Fin., Inc.*, 648 F.Supp.2d 690 (E.D.Penn.2009) (employer and employee shared in premium payments); *Pittinos v. Provident Life & Accident Ins. Co.*, No. CA 08–0662–KDC, 2009 WL 424317 (S.D.Ala. Feb. 17, 2009) (employer paid premiums); *Brown*, 2002 WL 1019021 (plaintiff estopped from arguing employer did not pay premiums). Other cases determine that a particular policy was governed by ERISA because it was entwined with an ERISA plan. *E.g.*, *Shipley v. Provident Life & Accident Ins. Co.*, 352 F.Supp.2d 1213, 1216 (S.D.Ala.2004) (enrollment in employer-paid long-term disability plan allowed enrollment in supplemental disability policy at a discount; employer's contribution to long-term plan was therefore a contribution to supplemental plan); *see also Glass v. United of Omaha Life Ins., Co.*, 33 F.3d 1341, 1345 (11th Cir.1994) (voluntary life plan not in safe harbor where it is available at a discount only to participants of basic life plan governed by ERISA).

There is no evidence that any such facts exist here. To the extent Defendants rely on the foregoing cases to argue that a non-negotiated group discount, without more,

constitutes a contribution under the first safe-harbor criterion, the Court finds these cases unpersuasive.

#### 4. Application

■ The Court begins with the clear meaning of the first criterion, which excludes from the safe harbor any insurance program to which the employer makes an actual financial contribution. *Morris*, 986 F.Supp. at 880. It is illogical to stretch this "clear meaning" to encompass a group discount that results solely from using payroll deductions to pay insurance premiums. *Turner v. Liberty Nat. Life Ins. Co.*, Nos. 1:11–cv–270, 2012 WL 711357, at *4 (E.D.Tenn. Mar. 5, 2012) ("clear meaning" of first criterion is "an actual contribution in the form of a partial (or full) payment of premiums," not merely allowing employees to pay premiums through payroll deduction with pre-tax dollars); *Letner v. Unum Life Ins. Co. of Am.*, 203 F.Supp.2d 1291, 1301 (N.D.Fla.2001) (rejecting the then-novel argument that insurer's premium discount constituted a contribution by the employer).

The Court next considers the interplay between the first and third criteria of the safe harbor. The third criterion specifically permits an employer "to collect premiums through payroll deductions ... and remit them to the insurer." 29 C.F.R. § 2510.3–1(j)(3). It is also not unusual for an insurer to offer some type of discount to a group, regardless of whether that group involves ERISA. *See Revello v. Paul Revere Life Ins. Co.*, 224 F.Supp.2d 946, 949 n. 3 (E.D.Penn.2002) (declining to follow *Brown* because "a discounted rate is the very essence of a group insurance plan—it is what distinguishes it from an individual policy"). There is no reason why the combination of two permissible actions—payroll deduction by the employer and a group discount from the insurer—would remove an insurance policy from the safe

harbor. *See Rosen v. Provident Life & Accident Ins. Co.*, No. 2:14–cv–0922–WMA, 2015 WL 260839, at *12 (N.D.Ala. Jan. 21, 2015) (discount based on payroll deduction would not remove policy from safe harbor; holding otherwise would be contrary to text of regulation and would swallow the third and fourth safe-harbor requirements). To hold otherwise would be to present an employer who did not wish to be drawn into ERISA with a nonsensical choice: either refuse to allow its employees to use payroll deductions for insurance premiums (which is specifically allowed under the safe harbor), or refuse to allow the insurer to offer its employees a premium discount (which would risk involving the employer in negotiating the terms of the policy, thereby potentially endorsing the plan under the third criterion of the safe harbor).

Unum Life's FlexBill discount was not negotiated by or particularized for the Gessler Clinic. It was a program Unum Life offered to any set of insureds who could persuade their employer to use payroll deduction for their premium payments, as permitted by the third criterion of the safe harbor. Unum Life did not pay any portion of Plaintiff's or the other insured physician's premiums. The Court concludes that the Gessler Clinic did not contribute to Plaintiff's insurance policy under the first criterion of the safe harbor.

### B. Endorsement by the Gessler Clinic

■ The third safe-harbor criterion requires that the employer's or employee organization's sole functions with respect to the program be, "without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions ... and to remit them to the insurer." 29 C.F.R. § 2510.3–1(j)(3). Endorsement in this context requires more than

merely recommending a program. *Thompson*, 95 F.3d at 436 (quoting and adopting approach of *Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1134 (1st Cir.1995)). A finding of endorsement "is appropriate if, upon examining all the relevant circumstances, there is some factual showing on the record of substantial employer involvement in the creation or administration of the plan." *Thompson*, 95 F.3d at 436.

> [A]s long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program under section 2510.3–1(j) . . . . It is only when an employer purposes to do more, and takes substantial steps in that direction, that it offends the ideal of employer neutrality and brings ERISA into the picture.

*Id.* (quoting *Johnson*, 63 F.3d at 1134).

The proper focus in assessing endorsement is on an employee's perspective: whether it would be reasonable for an employee to conclude, from his or her own observation of the employer's activities, that the employer had endorsed the policy. *Thompson*, 95 F.3d at 436 (citing *Johnson*, 63 F.3d at 1134 & 1137 n. 6); *see also Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 391 (6th Cir.2009) ("applying an employee-based vantage point to the third criterion is appropriate because it holds an employer responsible for its representations").

The Court of Appeals for the Sixth Circuit has set out a number of non-exclusive factors for courts to consider in determining whether an employer has remained neutral or has crossed the line to endorsement:

(1) Has the employer played an active role in either determining which employees will be eligible for coverage or in negotiating the terms of the policy or the benefits thereunder?

(2) Is the employer named as the plan administrator?

(3) Has the employer provided a plan description that specifically refers to ERISA or that the plan is governed by ERISA?

(4) Has the employer provided any materials to its employees suggesting that it has endorsed the plan?

(5) Does the employer participate in processing claims?

*Thompson*, 95 F.3d at 436–37; *see also Booth v. Life Ins. Co. of N. Am.*, No. 3:05CV–526–S, 2006 WL 3306846, at *2–*3, *3 n. 2 (W.D.Ky. Nov. 9, 2006) (collecting *Thompson* factors). A positive answer to one or more of these questions "may" indicate that a finding of endorsement is appropriate, but is not necessarily determinative. *Bailey v. Minn. Life Ins. Co.*, No. 07–196–JBC, 2009 WL 803701, at *3 (E.D.Ky. Mar. 24, 2009) (quoting *Thompson*, 95 F.3d at 436).

Defendants argue there was substantial involvement by the Gessler Clinic in administering the program from which employees of the Gessler Clinic could reasonably have concluded that the clinic endorsed the program. Plaintiff, however, argues that the Gessler Clinic remained neutral as to the insurance policies, and emphasizes Plaintiff's perspective on the transaction. Plaintiff also argues that unilateral communications from Defendants to the clinic cannot constitute endorsement of the program by the clinic. Because Defendants bear the burden of proof to establish jurisdiction, the Court examines each of Defendants' arguments on endorsement in turn.

Defendants claim the Gessler Clinic "gave instructions to Unum Life regarding individuals being covered (or not covered) under the plan" (Doc. 17 at 11), an assertion that could implicate the first of the *Thompson* factors: an active role in determining which employees will be eligible for coverage. In support, Defendants submit documentation of two phone calls from the Gessler Clinic regarding removing an insured, whose name has been redacted, from the FlexBill. (Doc. 18-9.) Defendants characterize this communication, together with the clinic's letter regarding Plaintiff's separation, as "facilitat[ing] the continuation of coverage under policies issued to departing employees." (Doc. 17 at 12.) Communicating to the insurer that an insured has left the organization, however— and that the corresponding premiums should no longer be billed to the organization—does not indicate endorsement in the same way as determining on the front end which employees or classes of employees will be eligible for coverage. If it were otherwise, an employer could be forced to mutely continue paying premiums while it waited for its former employee to get around to telling the insurer to send him or her the bills directly, just to avoid making the policy subject to ERISA.

Further, asking the insurer to send policy continuation information to a departing physician is at least equally consistent with "being helpful but impartial in providing the resources to its employees" as it is with endorsing the plan. *See Bailey*, 2009 WL 803701, at *6. The Gessler Clinic did not "endorse" the program by communi-

cating with the insurer regarding the separation of insured physicians.

Defendants next point to Unum Life's request for the Gessler Clinic to provide updated information on the insureds' salaries, to which the clinic presumably responded (Doc. 18-6), and Unum Life's letter to the clinic the next month saying Plaintiff would no longer be offered a "Benefit Indexing Option" because his coverage exceeded Unum Life's guidelines based on his new salary (Doc. 18-7). These communications regarding ministerial functions by the clinic likewise fail to show the clinic played an active role in determining which employees would be eligible for coverage or in negotiating the terms or benefits of the policy. *See Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1122 (9th Cir.1998) (employer's verification of full-time employment status for insurer "is clearly a ministerial function that is ancillary to other activities that create no ERISA plan under the safe harbor regulations") (citing *Johnson*, 63 F.3d at 1136).

██ Interestingly, Defendants next point to two activities of a kind actually mentioned in the third criterion—the clinic "permitted and/or facilitated a broker coming on site" to solicit insurance applications (Doc. 17 at 11) and the clinic "under[took] the receiving, processing and paying of group premiums" (*id.* at 12; *see also* Doc. 18-10)—to argue that the program is outside of the safe harbor. Both allowing an insurer to publicize its program and processing premium payments through payroll deduction are expressly allowed by the third criterion.[6] 29 C.F.R. § 2510.3–1(j)(3);

6. Defendants' hyperbolic assertion that if the Gessler Clinic did not want to "bring[ ] this program under ERISA ... it could have stayed out of the arrangement altogether" is therefore wrong. (Doc. 17 at 12.) The safe harbor nowhere requires an employer to "stay[ ] out of the arrangement altogether."

*See Johnson*, 63 F.3d at 1134 ("Remaining neutral does not require an employer to build a moat around a program or to separate itself from all aspects of program administration."). The whole purpose of the safe harbor is to allow an employer to assist with certain kinds

*see also Riggs v. Smith,* 953 F.Supp. 389, 391 (S.D.Fla.1997) (safe harbor applied where employer gathered quotes, scheduled time when insurance representative could present information to employees, executed a Member Firm Participation Agreement, and joined Chamber of Commerce to be eligible for employees' plan of choice). Defendants also point to communications between the clinic and Unum Life regarding allegedly overdue premiums (Doc. 18-8) as endorsement of the program. It cannot seriously be considered, however, that the safe harbor allows an employer to process premium payments through payroll deductions, but does not allow the employer to communicate with the insurer regarding billings and payments.

Finally, Defendants argue that Ms. Hart's completion of a form for Plaintiff's prior disability claim shows that the clinic endorsed the policy. (*See* Doc. 14-13.) This activity potentially implicates the fifth *Thompson* factor: whether the employer participates in processing claims. Merely completing a claim form for an employee seeking disability benefits is not a strong indication of "endorsement" of the policy, however. *See Bailey,* 2009 WL 803701, at *6 (employer's contacting insurer to give notice of insured's death and sending beneficiary condolence letter and benefit statement for completion and filing with the insurer "does not weigh heavily in favor of endorsement because a reasonable employee would have been aware at all times that [the employer] was performing minor administrative tasks on behalf of the

[insurer]"). As with requesting policy continuation information for an insured, this assistance is at least equally consistent with "being helpful but impartial in providing the resources to its employees" as it is with endorsing the plan.[7] *See id.* Defendants have presented no other evidence of the Gessler Clinic's participation in processing claims, or giving any input on which claims should or should not be granted. The Court finds that Ms. Hart's completion of the claim form, either alone or taken together with the other evidence offered by Defendants, is insufficient to establish that the Gessler Clinic endorsed the policy.

In summary, there is no evidence that the second, third, or fourth *Thompson* factors are implicated here: the Gessler Clinic is not the plan administrator, there is no plan description that mentions ERISA, and Defendants have not submitted any evidence that the Gessler Clinic provided any materials to the insureds suggesting that the clinic had endorsed the plan. Defendants' evidence on the first *Thompson* factor (an active role in determining which employees will be eligible for coverage or in negotiating the policy terms or benefits), fails to show any activities beyond ministerial functions in connection with the payroll deduction and billing process and allowing Mr. Tollerton to meet with potential insureds, as contemplated by the language of the third criterion. And the fifth *Thompson* factor does not weigh heavily, if it weighs at all, in favor of a finding of endorsement, where the only evidence of

---

of insurance arrangements without implicating ERISA. *See id.* at 1133.

7. This is especially so when considering the general nature of the relationship between Plaintiff and the Gessler Clinic. The Court would not be surprised to learn that an administrator for a medical clinic would routinely undertake even more extensive ministe-

rial functions than filling out a disability claim form as an accommodation for a physician who was a part owner of the business. (*See* Doc. 14-13.) Here, of course, there is no evidence regarding how Ms. Hart came to fill out the single claim form that appears in the record.

the Gessler Clinic's participation in "processing claims" was to complete and sign one claim form for a physician seeking disability benefits. The *Thompson* factors thus do not support a finding of endorsement in this case.

The Court is mindful that the *Thompson* factors are not exclusive. Examining all of the relevant circumstances, including which allegedly "endorsing" actions would have been visible from an insured physician's perspective, the Court concludes that the Gessler Clinic's actions have not offended the ideal of employer neutrality so as to remove the program from the safe harbor. There simply is no showing of substantial involvement by the Gessler Clinic in the creation or administration of the insurance program.

## IV. CONCLUSION

Because the insurance program meets all four criteria of the safe harbor, it is exempted from ERISA. This Court consequently does not have jurisdiction over this action. The Court will **GRANT** Plaintiff's motion to remand (Doc. 12). This case will be **REMANDED** to the court in which it originated, the Circuit Court for Hamilton County, Tennessee. The Court will also **DENY** Defendants' motion to file a surreply.

**An appropriate order will enter.**